**In re 11,111, INC., dba Energy Conservation Consultants, Debtor.**

**Bankruptcy No. 4–89–4240.**

United States Bankruptcy Court,
D. Minnesota.

Aug. 17, 1990.

---

472

Arthur C. Benson, Harvey, Sheehan & Benson, Minneapolis, Minn., for debtor.

Steven R. Hedges, Abdo and Abdo, Pros. Atty., Minneapolis, Minn., for objectors.

## ORDER CONFIRMING PLAN

ROBERT J. KRESSEL, Chief Judge.

This case came on for confirmation of the debtor's plan dated March 26, 1990. Arthur C. Benson appeared for the debtor. Steven R. Hedges appeared for Charles O. Martin and Daniel R. Pates. Katherine A. Constantine appeared for Lowell W. Hellervik. This court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 103(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(L). Based on the memoranda and arguments of counsel, the evidence presented at the hearing, and the file in this case, I make the following memorandum order.

## FACTUAL BACKGROUND

The debtor, 11,111, Inc., was incorporated on February 25, 1985 for the purpose of operating an infrared thermographic business. The debtor was initially capitalized by contributions from Lowell and Dennis Hellervik totalling $60,000.00.[1] Lowell and

---

1. The debtor was formed to provide a vehicle through which to acquire the assets of Energy Conservation Consultants, Inc. Dennis Hellervik, Charles Martin and Daniel Pates, all key employees of ECC, originally contemplated that each of them would make a capital contribution to enable the debtor to acquire the assets of ECC. However, Martin and Pates did not make any capital contributions to the debtor prior to its purchase of the assets of ECC.

Dennis Hellervik, Charles Martin, Daniel Pates,[2] and Scott Anderson were the original Directors of the debtor. Lowell Hellervik also served as Chairman of the Board, Dennis Hellervik as Treasurer, Pates as Secretary and Martin as Vice President of Operations.

On March 28, 1985, the debtor purchased the assets of Energy Conservation Consultants, Inc. from John M. Kendall, Energy Conservation Consultants' sole shareholder, for $320,000.00. The debtor paid Kendall $50,000.00 and issued $270,000.00 in promissory notes to him.

On June 26, 1985, Charles Martin made what was, in effect, a $25,000.00 loan to the debtor.[3] However, in order to circumvent Kendall's demand that any capital contribution made by Martin be applied to the balance owed to Kendall under the promissory note, Martin actually lent the $25,000.00 to Lowell Hellervik. Hellervik, in turn, contributed that sum to the debtor in exchange for an $18,750.00 promissory note and 6,250 shares of common stock. Hellervik assigned the promissory note to Martin. In addition, Hellervik executed a $6,250.00 non-recourse promissory note to Martin. As part of the latter transaction, Martin had the option to acquire 6,250 of Lowell Hellervik's shares of stock in the debtor. Martin never exercised that option.

That same day, Lowell and Dennis Hellervik and Martin executed a Memorandum of Understanding with respect to the organization and stock of the debtor. Pursuant to paragraph 4(b) of that agreement, Martin was named Vice President of Operations, at an annual salary of $30,000.00. The agreement provided that there would be no decrease in that salary without Martin's express written consent. However, the agreement further provided:

> Cash Flow. It is the intent of the parties that all amounts payable to John Kendall as a result of the purchase of ECC, Inc., shall be paid. Any remaining cash flow shall be dedicated to the payment of the salaries as provided in Section 4(b) hereof. Any remaining cash flow shall be utilized to pay the outstanding balance of the loans issued pursuant to paragraph 5 hereof.

During Martin's employment with the debtor, the difference between the salary to be paid to him pursuant to paragraph 4(b) of the Memorandum of Understanding and the amount actually paid to him was $12,650.00.

On October 18, 1985, Pates loaned the debtor $7,500.00, evidenced by a promissory note from the debtor. Pates also made a capital contribution of $2,500.00, in exchange for which he received 2,500 shares of common stock. That same date, Pates entered into an Employment Contract with the debtor, pursuant to which he was to receive an annual salary of $30,000.00.[4] However, the Employment Contract provided that the amount of compensation actually paid would be based upon the cash position of the corporation in the sole discretion of the Board of Directors.

**2.** The record in this case refers in some instances to Daniel Pates and in other instances to Donald Pates. Pates' Memorandum in Opposition to the Debtor's Objection to His Claim indicates that Pates' given name is Daniel, but his acquaintances know him as Donald. Therefore, it should be noted there is only one individual named Pates to which this order refers.

**3.** In a December 20, 1989 letter from John Halpern, then counsel for the unsecured creditors committee, to Arthur Benson, counsel for the debtor, the committee proposed that the disclosure statement be amended to state that Martin made a capital contribution of $25,000.00 to the debtor on June 26, 1985. The debtor has repeatedly cited this letter as an admission by Martin, then chairperson of the committee, that his claim arose, not from an unsecured loan,

but from a capital contribution. Even assuming this distinction is relevant, I do not consider Halpern's letter evidence of the nature of Martin's claim. The letter was prepared as part of the negotiation process leading to the submission of a mutually agreeable disclosure statement. It is not a part of the record concerning confirmation of the debtor's plan of reorganization.

**4.** Although the Memorandum of Understanding between the Hellerviks and Martin provided that Pates would serve as Secretary to the debtor at an annual salary of $30,000.00, Pates was not a party to that agreement. In addition, that agreement was executed on June 26, 1985, almost four months before Pates entered into his Employment Contract with the debtor.

Martin and Pates were employees of the debtor until November 1987, when they were fired. After Pates was fired, he sought to have the debtor repurchase his stock. However, the debtor asserted that the stock had no value. Thereafter, Pates was not treated as a shareholder of the debtor.

In February, 1988, Martin commenced an action against the debtor in Hennepin County District Court to recover under the $18,750.00 promissory note and to recover back salary. On May 26, 1989, Judge Jonathon Lebedoff issued his Findings of Fact, Conclusions of Law, Order for Judgment and Memorandum. Judge Lebedoff found that Martin's acceptance of a monthly salary less than that specified in the Memorandum of Understanding constituted an accord and satisfaction of amounts allegedly due and owing. Judge Lebedoff also found that the debtor was in default under the promissory note in the amount of $18,750.00 plus interest. Accordingly, he entered judgment in favor of Martin against the debtor in the principal sum of $18,750.00, plus fifteen percent annual interest.

The debtor filed a chapter 11 petition on September 7, 1989. The petition listed Martin and Pates as holders of unsecured claims in the amounts of $32,573.63 and $22,740.00 respectively. The petition further indicated that both claims were disputed and subject to setoff.

On September 21, 1990, the United States Trustee appointed a committee of unsecured creditors consisting solely of Martin and Pates. Martin was designated chairman of the committee.

On January 16, 1990, Pates filed a claim in the amount of $26,845.70, of which $11,150.00 represented salaries allegedly due for the period from October 18, 1985 through November 21, 1987, $2,059.00 represented accrued interest, and $1,730.70 represented a statutory penalty. In addition, $7,500.00 of the claim represented the principal balance due on a promissory note issued to Pates by the debtor, and $4,406.00 represented accrued interest.

In March 1990, the United States Trustee removed Martin and Pates from the unsecured creditors committee because he considered them insiders ineligible to serve on the committee. On March 23, 1990, he filed a report of inability to appoint a committee.

On March 23, 1990, Martin filed a general unsecured nonpriority claim in the amount of $30,390.60, of which $18,750.00 represented the principal balance on the promissory note issued to Martin by the debtor, and $11,640.60 represented accrued interest.[5]

On March 28, 1990, the debtor filed its second amended disclosure statement[6] and plan. The plan divides creditors into five classes, all of which are impaired. Classes I, II and III consist of the secured claims of John Kendall,[7] Norwest Bank Minneapolis, N.A.,[8] and Lowell W. Hellervik[9] respective-

---

5. Consistent with Judge Lebedoff's decision disallowing his claim for salary, Martin limited his claim to the amount due under the promissory note, plus interest. He did not seek to collect any allegedly unpaid salary.

6. By order dated May 10, 1990, I approved the debtor's third amended disclosure statement dated May 3, 1990, and directed the dissemination to creditors and all other parties in interest of the plan dated March 26, 1990.

7. Kendall's claim of $49,999.60 arises from his 1985 sale to the debtor of the assets of Energy Conservation Consultants, Inc. The sale was secured by all assets then transferred to the debtor or thereafter acquired by the debtor. The debtor proposes to make monthly payments of $952.47 to Kendall until the replacement promissory note in the amount of $65,000.00 is

fully paid. The plan further provides that Kendall will retain his security interest.

8. Norwest's claim of $44,600.00 arises from a line of credit secured by all the debtor's accounts receivable, bank accounts and other rights to payment. The debtor proposes to continue paying Norwest pursuant to the terms of the Stipulation for Use of Cash Collateral filed on November 14, 1989, and approved by order dated November 21, 1989. That stipulation requires that the debtor make monthly installment payments of $2,000.00 during the months of June, July, August, September, October and November of each year until the entire debt is paid in full.

9. Lowell Hellervik loaned the debtor a total of $92,702.00 over the four year period from March 1985 through May 1989. In May of 1989,

ly. Class IV consists of "all unsecured claims of non-priority, nonshareholder creditors of the Debtor whose claims did not arise out of or in association with capital contributions to the Debtor ..." [10] The plan proposes to pay to Class IV creditors forty percent of the total amount of their respective claims on or before thirty days following the effective date of the plan.

Class V consists of "all unsecured claims of persons who are currently equity security holders of the debtor or who were or became entitled to become equity security holders at the time the basis for their claims arose." Specifically included in this class are:

(1) the claims of Dennis Hellervik and Lowell Hellervik as tenants in common owners of 15,000 shares of common stock and a promissory note in the amount of $45,000.00;

(2) the claim of Dennis Hellervik arising from a $1,557.00 unsecured loan to the debtor;

(3) the claim of Lowell Hellervik arising from $82,702.00 in unsecured loans to the debtor; [11]

(4) the claim of Donald Pates as owner of 2,500 shares of common stock and holder of a promissory note in the amount of $7,500.00; and

(5) the claim of Charles Martin as owner of 6,250 shares of common stock and holder of a promissory note in the amount of $18,750.00.[12]

The plan provides that members of this class will receive no payment under the plan, and their stock, or rights to acquire stock, will be retired and cancelled.

The plan further provides that Dennis and Lowell Hellervik will contribute funds as necessary to enable the debtor to pay the proposed forty percent dividend to Class IV creditors. The Hellerviks will receive new stock in the corporation equivalent to their contributions.

On May 2, 1990, the debtor filed objections to Martin's and Pates' claims. The debtor argued that both claims were those of equity security holders arising from capital contributions to the debtor, and hence, were junior to claims of general unsecured creditors. The debtor further argued that the promissory notes issued to Martin and Pates were subject to valid and enforceable subordination agreements, and, under Bankruptcy Code § 510(c), should be subordinated to claims of general unsecured creditors. As to Pates' salary claim, the debtor argued that all salaries due Pates had been paid, and any additional claims were barred by the doctrine of accord and satisfaction, or, alternatively, by the doctrine of collateral estoppel or the statute of limitations.

By orders dated June 8, 1990, I allowed Martin a general unsecured claim in the amount of $30,390.60, and Pates a general unsecured claim in the amount of $11,906.00. I further determined that neither claim was subject to subordination. However, I indicated at the hearing these issues would be moot if the plan was confirmed as filed.

Martin and Pates failed to file any written objections to the plan prior to the original hearing on confirmation on June 20, 1990. At that hearing, they orally objected to the plan and its proposed treatment of their claims. Based on their agreement to pay the debtor's attorney fees and ex-

---

the debtor granted Lowell Hellervik a security interest in all the debtor's assets to secure the entire $92,702.00 debt. Of this amount, $82,704.00 was unpaid at the time of the filing of the debtor's chapter 11 petition. The plan proposes to treat this debt as an unsecured claim of an equity security holder. Accordingly, Lowell Hellervik will receive nothing on account of this claim.

**10.** The plan's definition of "unsecured creditors" specifically excludes "unsecured claims of persons who at the time of the creation of their claim were equity security holders of the Debtor or who, as a condition of their claim, held a right to become equity security holders of the Debtor."

**11.** It appears that this claim is identical to that in Class III. It is unclear to me why the plan includes this claim twice in two separate classes, although the claim in Class III is purportedly secured, while the claim in Class V is expressly described as unsecured.

**12.** A more carefully crafted plan would have put the stock interests in a separate class.

penses attributable to a continued hearing, I continued the confirmation hearing to June 26, 1990, to allow Martin and Pates to submit written objections. I further ordered the debtor to file its ballot summary, which it had failed to do in advance of the originally scheduled confirmation hearing.

On June 22, 1990, the debtor filed a ballot report. A summary of the voting is as follows:

| Class | # Ballots Accepting | $ Amount of claims | # Ballots Rejecting | $ Amount of claims | % Accepting Number | % Accepting $ Amount |
|---|---|---|---|---|---|---|
| I | 1 | $49,990.60 | –0– | –0– | 100 | 100 |
| II | 1 | $44,600.00 | –0– | –0– | 100 | 100 |
| III | 1 [13] | $92,702.00[14] | –0– | –0– | 100 | 100 |
| IV | 4 | $ 8,290.74 | –0– | –0– | 100 | 100 |
| V | 0 | –0– | 2 | $42,292.60 | –0– | –0– |

On June 25, 1990, Martin and Pates filed their objections to confirmation. Martin and Pates object to confirmation on two grounds. They argue that the classification of creditors in the plan is inconsistent with the provisions of chapter 11 of the Bankruptcy Code, in that the plan's definition of "unsecured creditors" is modified to exclude the claims of Martin and Pates. They further argue that the classification of Martin and Pates is unfair, arbitrary, designed to manipulate class voting, and inconsistent with my June 8, 1990 orders denying the debtor's motion to subordinate Martin's and Pates' claims. Finally, Martin and Pates argue that the plan is not fair and equitable in that the proposed distribution to unsecured creditors is less than the amount that would be paid if the debtor's estate was liquidated under chapter 7.

## DISCUSSION

### I. Classification

■ Bankruptcy Code § 1122(a) provides, in relevant part:

> ... a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a). However, while § 1122(a) requires that a given class in a plan of reorganization consist of substantially similar claims, all substantially similar claims need not be included in the same class. *Hanson v. First Bank of South Dakota*, 828 F.2d 1310 (8th Cir.1987). In *Hanson*, the Eighth Circuit expressly held that § 1122(a) does not prohibit the placement of substantially similar claims in different classes. Rather, § 1122 authorizes flexibility in classification consistent with the rehabilitative purposes of chapter 11. *See In re Greystone III Joint Venture*, 102 B.R. 560, 568 (Bktcy.W.D.Tex.1989). However,

> [t]he debtor's discretion to place similar claims in different classes is not unlimited ... Classifications designed to manipulate class voting must be carefully scrutinized. There is potential for abuse when the debtor has the power to classify creditors in a manner to assure that at least one class of impaired creditors will vote for the plan, thereby making it eligible for the cram down provisions.

*Hanson*, 828 F.2d at 1313. Therefore,

> [e]xamining the propriety of the classification scheme focuses on the peculiar equities of each case, leading a court to exercise its equitable powers in the inter-

---

**13.** The debtor's ballot summary reflects that Lowell Hellervik cast a ballot accepting the plan as to his Class III claim, and cast no ballot as to his identical Class V claim.

**14.** According to the debtor's third amended disclosure statement, Lowell Hellervik's claim is $82,702.00, not $92,702.00. However, this discrepancy does not affect the outcome of the voting.

ests of forwarding the reorganization policy which underlies the Bankruptcy Code.

*Greystone,* 102 B.R. at 568, *citing United States v. Whiting Pools, Inc.,* 462 U.S. 198, 203, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1982); H.R.Rep. No. 595, 95th Cong., 1st Sess. 220 (1977), U.S.Code Cong. & Admin. News 1978, p. 5787.

Martin and Pates' objection to the debtor's proposed classification of their claims is two-fold. They assert that their inclusion in the same class with the Hellerviks is improper, in that it is designed to manipulate voting. They further assert that their exclusion from the unsecured creditor class is improper, in that it is arbitrary, unfairly discriminatory, unfair and inequitable. I will address these arguments separately.

### A. Classification with the Hellerviks

Martin and Pates argue that their inclusion in the same class with the Hellerviks was designed to manipulate voting to achieve confirmation of the plan. Martin and Pates further assert that the Hellerviks' claims so outweighed theirs that Martin and Pates' votes rejecting the plan were meaningless.

Martin and Pates' objections in this regard are completely without merit. A cursory review of the ballot summary indicates that Martin and Pates voted to reject the plan, while the Hellerviks failed to vote at all. Notwithstanding the size of the Hellerviks' claims, Martin and Pates can hardly argue that their votes were rendered meaningless when theirs were the only votes counted in Class V.

■ Bankruptcy Code § 1126(g) provides that classes which receive nothing under the plan are deemed to reject the plan.[15]

Under the terms of the plan, Class V creditors will receive no payment on account of their claims. Therefore, Class V is deemed to reject the plan by operation of § 1126(g). Accordingly, even assuming the classification of Martin and Pates with the Hellerviks was somehow erroneous, that error was harmless. Had Martin and Pates been classified separately from the Hellerviks, the result would simply have been two rejecting classes rather than one.

■ Finally, Martin and Pates' arguments fail to address the pivotal issue in determining whether their claims are properly classified with the Hellerviks' claims—namely, whether their claims are substantially similar to the Hellerviks' claims as required by § 1122(a). Martin and Pates' claims, like those of the Hellerviks, arise from loans to the debtor made in conjunction with the purchase of stock or an option to purchase stock. The loans were made at a time when Martin, Pates, and the Hellerviks were directors and officers of the debtor. Therefore, I find that the claims of Martin and Pates are substantially similar to those of the Hellerviks, and are appropriately classified with the claims of the Hellerviks in Class V.

### B. Classification separate from other unsecured creditors:

### Unfair Discrimination

The second prong of Martin and Pates' classification objection goes to the alleged impropriety of their exclusion from Class IV, the class of general unsecured creditors entitled to a forty percent dividend under the plan. Martin and Pates argue that by excluding them from the class of general unsecured claims, and, more importantly, from sharing in the forty percent dividend

---

15. Section 1126 of the Bankruptcy Code provides, in relevant part:

.  .  .  .  .

(c) A class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan.
(d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests ... that hold at least two-thirds

in amount of the allowed interests of such class held by holders of such interests ... that have accepted or rejected such plan.

.  .  .  .  .

(g) Notwithstanding any other provision of this section, *a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.*

11 U.S.C. § 1126 (emphasis added).

to be paid to those unsecured creditors, the plan is arbitrary, unfairly discriminatory, unfair and inequitable.

■ The issue of unfair discrimination arises only in a so-called cramdown situation, in which one or more impaired classes of creditors have rejected the plan, but all other confirmation requirements in § 1129(a) have been satisfied. In such a situation, the provisions of § 1129(b) come into play. That section provides:

(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) [16] are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if *the plan does not discriminate unfairly,* and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.[17]

11 U.S.C. § 1129(b) (emphasis added).

Section 1129(b)(1) does not prohibit all discrimination, but only that discrimination which is unfair. *In re Storberg,* 94 B.R. 144 (Bktcy.D.Minn.1988). In *Storberg,* I cited the four-part test followed by a large number of courts in assessing the "fairness" of discrimination:

1. Whether the discrimination is supported by a reasonable basis;
2. Whether the debtor can confirm and consummate a plan without the discrimination;
3. Whether the discrimination is proposed in good faith; and
4. The treatment of the classes discriminated against.

*Id.* at 146. *See, also, In re Aztec Co.,* 107 B.R. 585, 590 (Bktcy.M.D.Tenn.1989).

In *Matter of LeBlanc,* 622 F.2d 872 (5th Cir.1980), the Fifth Circuit affirmed the Bankruptcy Court's confirmation of a plan which separately classified trade creditors

and insiders. The plan provided for payment of forty percent of unsecured trade creditors' claims over $200. Insiders were to receive nothing under the plan. The court noted that, while trade creditors with unsecured claims received better treatment than insiders with unsecured claims, that fact alone did not establish arbitrary or discriminatory classification. Rather, the court upheld the proposed classification, finding that:

trade creditors advanced goods and services to the debtor in the ordinary course of business, frequently without any knowledge of the debtor's financial condition and without any real opportunity to protect themselves ... In contrast, the insiders made loans to the debtor when they were in a position to know of the debtor's financial condition and the risks involved with those loans.

*Id.* at 879.

■ While the debtor's proposed treatment of Martin and Pates may be discriminatory, I do not think that discrimination is unfair. Like the insiders in *LeBlanc,* Martin and Pates knew they were putting their money at risk when they loaned money to the debtor. As officers, directors, and employees of the debtor, they were fully aware of the financial condition of the debtor at the time they made their loans, and for several years thereafter. As officers, directors, and employees of the debtor, they were in a unique position to influence the ongoing financial and business operations of the debtor. Therefore, the debtor's proposed classification of Martin and Pates' claims separately from those of other general unsecured claimants without the same knowledge or influence has a reasonable basis and is not unfairly discriminatory.

## II. Best Interest of Creditors Test

Martin and Pates' final objection to plan confirmation focuses on the best interest of

---

**16.** 11 U.S.C. § 1129(a)(8) provides:

(8) With respect to each class of claims or interests—

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

**17.** The fair and equitable rule has other elements which are not at issue in this case.

creditors test in § 1129(a)(7). Section 1129(a)(7) provides:

> With respect to each impaired class of claims or interests—
>> (A) each holder of a claim or interest of such class—
>>> (i) has accepted the plan; or
>>> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . .

11 U.S.C. § 1129(a)(7). Martin and Pates argue that the plan fails to satisfy this test in that the plan's proposed distribution to unsecured creditors is less than the amount they would receive if the debtor's assets were liquidated under chapter 7.

The parties submitted numerous documents, letters, affidavits, and oral testimony concerning the appropriate values to be assigned to the debtor's assets for purposes of computing liquidation value:

|  | Debtor's Estimate | Martin/Pates' Estimate |
| --- | --- | --- |
| Total Assets (liquidation value) | $112,635.00 | $ 200,388.00 |
| Estimated Administrative Expenses | (12,000.00) | (12,000.00) |
| Secured Creditor Claims | (94,599.00) [18] | (94,599.00) |
| Net Available for Unsecured Creditors | $ 6,035.40 | $ 93,789.60 |

In calculating the net amount available for distribution to unsecured creditors, the parties' liquidation analyses subtract the secured claims of John Kendall and Norwest Bank. However, the parties fail to take into account the $82,702.00 secured claim of Lowell Hellervik. Lowell Hellervik loaned a total of $92,702.00 to the debtor over a four year period from March 1985 through May 1989. In May 1989, the debtor granted Lowell Hellervik a security interest in all its assets to secure its then-existing $92,702.00 debt to him. A financing statement evidencing that security interest was filed with the Minnesota Secretary of State on May 5, 1989.

■ The plan proposes to treat Lowell Hellervik's secured claim as an unsecured Class V claim on account of which no dividend will be paid under the plan. He agreed to that treatment by casting a ballot accepting the plan. Even if Lowell Hellervik waived his $82,702.00 secured claim to enable the debtor to propose a feasible plan, that claim must be treated as a secured claim in calculating the liquidation value of the debtor's assets. Therefore, under the debtor's liquidation analysis, that claim is secured to the extent of $6,035.40. Under Martin and Pates' liquidation analysis, the claim is fully secured. The liquidation analysis is as follows:

|  | Debtor's Estimate | Martin/Pates' Estimate |
| --- | --- | --- |
| Total Assets (liquidation value) | $112,635.00 | $ 200,388.00 |
| Estimated Administrative Expenses | (12,000.00) | (12,000.00) |
| Secured Creditor Claims | (177,301.00) [19] | (177,301.00) |
| Net Available for Unsecured Creditors | $ –0– | $ 11,087.00 |

Using these figures as a starting point, the only significant differences between the debtor's liquidation analysis and Martin and Pates' liquidation analysis are the val-

---

**18.** This figure represents Kendall's claim of $49,999.60 and Norwest's claim of $44,600.00.

**19.** This figure now includes the $82,702.00 secured claim of Lowell Hellervik.

ues of ten specialized cameras and lenses and the inclusion by Martin and Pates of a $30,000.00 customer list and $7,500.00 list of names and phone numbers.

The debtor asserts that the cameras and lenses have a total liquidation value of $40,000.00. Martin and Pates assert that these cameras have a total liquidation value of $92,000.

At the continued confirmation hearing, Dennis Hellervik testified that the cameras at issue are in excess of ten years old. He also testified that these cameras require the use of liquid nitrogen. Due to a change in technology, newer models of these same cameras now utilize an electronic cooling system rather than a liquid nitrogen system.

Martin submitted several affidavits [20] in support of the liquidation values he and Pates assert are correct. Attached to his June 25, 1990 affidavit are letters from two companies purported active in buying and selling the type of camera equipment owned by the debtor. However, these letters refer to market value, not liquidation value, for this type of equipment.

Without engaging in a tedious and unnecessary item-by-item evaluation, I find that greater weight must be accorded the debtor's estimates of liquidation value of the camera equipment, absent strong evidence from Martin and Pates to refute those estimates. The debtor's valuation takes into consideration the age and condition of these particular cameras and lenses. Martin and Pates rely on letters concerning the market value of these types of cameras and lenses, and their personal knowledge of the cost of comparable new equipment. I find this unpersuasive.

I find that, were the debtor to liquidate its assets in a chapter 7 case, no funds would be available for distribution to unsecured creditors. Therefore, the debtor's plan satisfies the best interest of creditors requirement in § 1129(a)(7).

## CONCLUSION

The debtor's classification of Martin and Pates is neither unfairly discriminatory, unfair or inequitable. In addition, the plan proposes to pay to unsecured creditors more than they would receive if the assets of the debtor were liquidated in a case under chapter 7. Therefore, I conclude that the debtor's March 26, 1990 satisfies the statutory requirements for confirmation set forth in 11 U.S.C. § 1129 and may be confirmed.

THEREFORE, it is ordered:

1. The objections of Charles Martin and Daniel Pates are overruled; and

2. The debtor's plan dated March 26, 1990 and filed March 28, 1990 is confirmed.

---

**20.** Martin submitted his second affidavit on June 26, 1990, the day of the continued confirmation hearing. The debtor objected to this affidavit as untimely.