**In re SOVEREIGN GROUP 1985–27, LTD., a Pennsylvania limited partnership d/b/a Cambridge Village Apartments Limited Partnership.**

**Civ. A. No. 90–2396.**

**Bankruptcy No. 89–10721F.**

United States District Court, E.D. Pennsylvania.

June 30, 1992.

---

Henry F. Reichner, Reed, Smith, Shaw & McClay, Philadelphia, Pa., Stephen M. Lyons, III, Philadelphia, Pa., for Sovereign Group 1985–27, plaintiff and Northern Cent. Bank, appellant.

MEMORANDUM AND ORDER

BECHTLE, Chief Judge.

Presently before the court is Northern Central Bank's ("Bank") appeal from the

Order of the bankruptcy court confirming the Sixth Amended Plan of Reorganization ("Plan") of Sovereign Group 1985–27, Ltd., a Pennsylvania limited partnership d/b/a Cambridge Village Apartments Limited Partnership ("Debtor") and entering a permanent injunction against foreclosure in a case arising under Chapter 11 of the Bankruptcy Code. 11 U.S.C. § 1101 *et seq.* For the reasons set forth below, the decision of the bankruptcy court will be reversed, and the matter will be remanded to the bankruptcy court for further proceedings in accordance with the terms of this Memorandum and Order.

## BACKGROUND

The Debtor is a limited partnership which owns a single asset, a 246 unit apartment complex located in Tucson, Arizona, known as the Cambridge Village Apartments ("Property"). On February 22, 1989, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code. At the time of the filing of the bankruptcy petition, the Debtor owed Northern Central Bank ("Bank"), its largest creditor, approximately $7,900,000 through a nonrecourse note secured by the Property. As of the effective date of the Plan, the Property was valued at $4,100,000. Therefore, the Bank has an allowed secured claim of $4,100,000 and an allowed unsecured claim of $3,800,000.

A hearing on confirmation of the Debtor's Sixth Amended Plan of Reorganization was held on December 18, 1989.[1] This confirmation hearing was consolidated with the hearing on the Debtor's complaint for a permanent injunction to preclude the Bank from foreclosing on the Property.[2]

At the confirmation hearing, evidence was presented that all classes of creditors, except the class which consisted of the Bank's claims, accepted the Sixth Amended Plan of Reorganization. The parties stipulated that the confirmation could be attained only through the "cramdown" provisions of 11 U.S.C. § 1129(b).[3]

On February 28, 1990, the bankruptcy court issued an Order confirming the Sixth Amended Plan of Reorganization and making the preliminary injunction of foreclosure permanent.[4] The Plan has separate provisions covering the repayment of the Bank's secured and unsecured claims.

As for the Bank's allowed secured claim of $4,100,000, the Plan provides that the secured debt will be amortized over 36 years at an annual interest rate of 10%, with the Debtor making monthly payments of $35,141.29 for a period of 10 years. Deferred interest at the rate of 4% per annum will accrue and become payable, together with the principal amount remaining due on the claim, on the ninetieth day after the tenth anniversary of the effective date of the Plan. During the life of the Plan, the bank retains its lien upon the realty and a lien upon all net rentals which accrued after September 22, 1989.

The Plan's provisions for the payment of the secured claim enlarges the payment period contained in the original loan. Moreover, the Plan, unlike the original note, does not require annual prepayments in amounts necessary to achieve a 75% loan-to-property value ratio.

The Bank's unsecured claim of $3,800,000 is to be paid differently. The Plan provides that the Bank will receive all postpetition contributions made by the limited

---

**1.** The filing of the Debtor's petition for relief was followed by several attempts at formulating a satisfactory plan of reorganization and resulted in the issuance of several Memoranda and Orders by the bankruptcy court. The present appeal does not concern any of those prior Orders.

**2.** The bankruptcy court had preliminarily enjoined the Bank from executing on the Property by Order dated October 27, 1989.

**3.** Ordinarily, a plan is confirmed when it satisfies the requirements of § 1129(a)(1)–(11). However, where one class of creditors objects to the plan, hence resulting in a failure to satisfy § 1129(a)(8), the plan may be confirmed pursu-

ant to § 1129(b), provided that all requisite criteria are met.

**4.** The Plan incorporates several modifications made after the confirmation hearing which the bankruptcy court requested the Debtor to submit to reflect oral modifications made at the hearing.

The Plan also includes modifications made by the court *sua sponte.* The Bank claims that the bankruptcy court erred in making its own modifications to the Plan. In light of the court's holding, it is not necessary to rule on the power of the bankruptcy court to make modifications.

partners, which, at the time of confirmation, equaled $120,000.[5] The Plan also provides that the Bank would receive a 10% special limited partnership interest and would be entitled to 10% of the net proceeds upon the sale or refinancing of the debtor's apartment complex, after payment of all secured claims. Should the property be refinanced prior to such sale, 10% of the equity achieved by such refinancing would also be payable to the Bank. As the bankruptcy court acknowledged, the Bank's $3,800,000 unsecured claim is not likely to be paid in full under the Plan.

An additional feature of the Plan allows the general and limited partners to retain their equity interests in the Debtor by making specified contributions. Under the Plan, limited partners may retain a limited partnership interest by contributing $10,000 per partnership unit.[6] To retain a general partnership interest, each of the two general partners must contribute $7,500 per partnership unit, plus they must collectively guarantee any cash flow shortfall up to $200,000.

The bankruptcy court valued the total contributions of the general and limited partners at the time of confirmation as equalling $200,000. This total figure is comprised of $120,000 cash (directly payable to the Bank on the effective date of the Plan), which was contributed in return for limited partnership interests, $15,000 cash contributions made by the general partners, and the value of the general partners' cash flow guarantee, which the bankruptcy court estimated to be worth $65,000.

The Bank presently appeals the Order confirming the Plan. The Bank's appeal, while raising a variety of issues, centers on the Plan's treatment of the Bank's unsecured claim and the ability of the partners to retain a partnership interest in the Debtor.

## DISCUSSION

### Standard of Review

The bankruptcy court's findings of fact may not be disturbed on appeal absent clear error. Bankruptcy Rule 8013. The bankruptcy court's conclusions of law, however, are subject to plenary review. *Brown v. Pennsylvania State Employees Credit Union*, 851 F.2d 81, 84 (3d Cir. 1988).

### Absolute Priority Rule

The bankruptcy court confirmed the Plan under the cramdown provisions of § 1129(b), which allow a bankruptcy court to confirm a plan, notwithstanding the rejection of the plan by an impaired class of creditors. However, the plan must not "discriminate unfairly" and must be "fair and equitable" with respect to each dissenting class of creditors. 11 U.S.C. § 1129(b)(1).

In an effort to construe the undefined requirement of the pre-Code bankruptcy law that a plan of reorganization be "fair and equitable," the courts created what is known as the "absolute priority rule." *See Northern P.R. Co. v. Boyd*, 228 U.S. 482, 504–505, 33 S.Ct. 554, 560–561, 57 L.Ed. 931 (1913); *Louisville Trust Co. v. Louisville, N.A. & C.R. Co.*, 174 U.S. 674, 684, 19 S.Ct. 827, 830, 43 L.Ed. 1130 (1899). Under that rule, no junior class of creditors could retain property under the reorganization plan if a dissenting class of unsecured creditors were not provided for in full. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988) (*"Ahlers"*). This rule was incorporated into the 1978 Bankruptcy Code. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Under current law, failure to comply with the absolute priority rule is fatal to the proposed plan of reorganization.

The Bank's primary argument is that the Plan violates the absolute priority rule, and

---

**5.** At the time of confirmation of the Plan, 6 of the 31 limited partners had elected to contribute $10,000 each to preserve a limited partnership interest. Additionally, one of the general partners had agreed to purchase 6 limited partnership interests in return for a $60,000 contribution.

**6.** A limited partner or general partner may also acquire the partnership interest of any limited partner who chooses not to retain a partnership interest. In the event that the limited partner declines to make the required investment and no general or limited partner opts to make the investment, that partnership interest terminates the day after the effective date of the Plan.

is therefore ineligible for confirmation under the § 1129(b) cramdown. The Bank contends that the Plan violates the absolute priority rule because it allows the limited and general partners, a class of creditors junior to the Bank, to retain an interest in the property while a large portion of the Bank's unsecured claim will go unpaid.

The Debtor does not contest the Bank's assertion that the Plan violates the absolute priority rule but instead argues that there exists an exception to the absolute priority rule which makes the Plan eligible for confirmation under § 1129(b). This exception, known as the "new value exception," was utilized by the bankruptcy court in confirming the Plan.

The new value exception was first announced by the Supreme Court in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939), wherein the court stated:

> It is, of course, clear that there are circumstances under which stockholders may participate in a plan of reorganization of an insolvent debtor ... Where that necessity exists and the old stockholders make a fresh contribution and receive in return a participation reasonably equivalent to their contribution, no objection can be made ...

*Id.* at 121–22, 60 S.Ct. at 10. The new value exception is essentially dicta, *Ahlers*, 485 U.S. at 203, 108 S.Ct. at 967; nonetheless, courts have relied upon it to confirm plans of reorganization which allow existing equity holders to retain their interests, notwithstanding the failure to pay all creditors in full.

*Availability of the New Value Exception*

■ The Bank maintains that the bankruptcy court erred in applying the new value exception, arguing that the exception did not survive the enactment of the Bankruptcy Code in 1978. The court rejects the Bank's contention and finds that the passage of the Code did not extinguish the exception.[7]

Neither the Supreme Court nor the Court of Appeals for the Third Circuit has specifically ruled upon the issue of the continued viability of the new value exception after the enactment of the 1978 Bankruptcy Code.

The Bank argues that the Supreme Court, in the *Ahlers* decision, has "more than implied" that the new value exception did not survive the enactment of the 1978 Code. (Brief of Appellant at 15.) The court rejects this unsupported assertion. Nothing in the *Ahlers* opinion can be construed as implying the continued existence or the absolute extinction of the new value exception upon passage of the Code. In fact, the Supreme Court emphatically declined to comment on the exception's validity under the 1978 Code, stating:

> The United States, as *amicus curiae*, urges us to reverse the Court of Appeals' ruling and hold that codification of the absolute priority rule has eliminated any 'exception' to that rule suggested by *Los Angeles Lumber* (citation omitted) ... We need not reach this question to resolve the instant dispute ...
>
> Thus, our decision today should not be taken as any comment on the continuing vitality of the *Los Angeles Lumber* exception—a question which has divided

---

**7.** Resolving the issue of the continued vitality of the new value exception is not vital to deciding the present appeal, as that issue does not govern the ultimate conclusion reached by the court. The plan should not have been confirmed regardless of the availability of the exception. Absent the new value exception, the bankruptcy court erred in confirming the plan because it violates the absolute priority rule of § 1129(b)(2)(B)(ii). Moreover, the availability of the exception does not lead to an affirmance of the bankruptcy court because, as discussed *infra*, the plan does not satisfy the requirements for application of the exception. Hence, since

the availability of the exception is, for the purposes of this appeal, a distinction without a difference, the court could abstain from ruling on this issue by simply making assumptions regarding the continued vitality of the exception.

However, there exists a strong possibility that on remand, equityholder contributions will again become an issue in confirmation and would be presented to this court in a subsequent appeal. Noting the absence of authority addressing the issue in this Circuit, the court finds it necessary to decide this issue in the interest of facilitating the confirmation of the Plan.

the lower courts since passage of the Code in 1978.

*Ahlers,* 485 U.S. at 203–204, 108 S.Ct. at 967, n. 3.

As noted by the Supreme Court, the issue of the exception's survival has divided the courts since the Code was enacted, but the Supreme Court's comments in *Ahlers* have not alleviated the controversy.[8]

The Bank correctly points out that the Code does not specifically provide for an exception to the absolute priority rule. The Bank argues that the omission of any exception unambiguously indicates that no exception exists. The Bank contends that the plain meaning of the statute is clear, and as such, the statutory language is conclusive. *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

On the other hand, the statutory language appears to be less clear in light of the fact that the new value exception is a judicially created exception which was in full use prior to the enactment of the Code in 1978. Where Congress intends for legislation to change the interpretation of judicially created concepts, it makes that intent specific; absent such specific intent, it is presumed that Congress did not intend to change prior-existing law. *Midlantic National Bank v. New Jersey Department of Environmental Protection,* 474 U.S. 494, 501, 106 S.Ct. 755, 759, 88 L.Ed.2d 859 (1986).

Additionally, the Supreme Court recently reasserted the significance of bankruptcy practice prior to the passage of the Code and the Court's unwillingness to interpret the Code in a manner contrary to pre-Code practice, stating:

> When Congress amends the bankruptcy laws, it does not write 'on a clean slate.' Furthermore, this Court has been reluctant to accept arguments that would interpret the Code, however vague the particular language under consideration might be, to effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history.

*Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992) (citations omitted). This court is likewise hesitant to read the Code in contravention of pre-Code practice and will not hold that the new value exception has been extinguished.

Furthermore, this court, like others before it, finds no evidence, in either the language of § 1129(b)(2) or in the accompanying legislative history, which indicates Congress intended to change the absolute priority rule or to extinguish the new value exception. *See e.g. In re Triple R Holdings, L.P.,* 134 B.R. 382 (Bankr.N.D.Cal. 1991); *In re Tallahassee Assoc., L.P.,* 132 B.R. 712, at 717–718 (Bankr.W.D.Pa.1991); *In re Pullman Constr. Indus., Inc.,* 107 B.R. 909, at 946–48 (Bankr.N.D.Ill.1989).

Based on the pre-Code establishment and use of the new value exception and the absence of evidence of Congressional intent to alter that pre-Code practice, the court concludes that the new value exception re-

---

**8.** Some courts hold that the new value exception has survived. *See e.g. In re Triple R Holdings, L.P.,* 134 B.R. 382 (Bankr.N.D.Cal.1991); *In re Tallahassee Assoc., L.P.,* 132 B.R. 712 (Bankr. W.D.Pa.1991); *In re Woodscape Ltd. Partnership,* 134 B.R. 165 (Bankr.D.Md.1991); *In re Pullman Constr. Industries, Inc.,* 107 B.R. 909 (Bankr.N.D.Ill.1989); *In re 222 Liberty Associates,* 108 B.R. 971 (Bankr.E.D.Pa.1990); *In re Aztec Company,* 107 B.R. 585 (Bankr.M.D.Tenn. 1989); *In re Henke,* 90 B.R. 451 (Bankr.D.Mont. 1988).

On the other hand, some courts have held that the passage of the Code eliminated the exception. *See e.g. Piedmont Assoc. v. Cigna Property & Casualty Ins. Co.,* 132 B.R. 75 (N.D.Ga.1991); *In re Outlook/Century Ltd.,* 127 B.R. 650 (Bankr. N.D.Cal.1991); *In re Lumber Exchange, Ltd.*

*Partnership,* 125 B.R. 1000 (Bankr.D.Minn. 1991); *In re Drimmel,* 108 B.R. 284, 288 (Bankr. D.Kan.1989), aff'd 135 B.R. 410 (D.C.Kan.1991); *In re Winters,* 99 B.R. 658 (Bankr.W.D.Pa.1989).

The Fifth Circuit is the only circuit court who has issued a ruling holding that the new value exception does not exist, *In re Greystone III Joint Venture,* 948 F.2d 134 (5th Cir.); however, that portion of *Greystone* which addressed the continued viability of the new value exception was subsequently withdrawn without explanation. *In re Greystone III Joint Venture,* 948 F.2d 134 (5th Cir.1992).

The Fourth and Seventh Circuits have questioned the existence of the new value exception, but they have not ruled on the issue. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351 (7th Cir.1990); *In re Bryson Properties XVIII,* 961 F.2d 496 (4th Cir.1992).

mains valid law.[9]  Accordingly, the bankruptcy court did not err in relying upon that exception in confirming the Plan.

*Application of the New Value Exception*

■ Although the new value exception may be used to confirm plans which allow an equity holder to retain its interest despite the objection of unpaid or underpaid unsecured creditors, the present plan is not one to which the exception properly applies. As the Supreme Court noted in *Case*, stringent conditions limit the application of the rule.  In order for the new value exception to apply, the contribution made by the equity holder must be: 1) in "money or money's worth"; 2) "reasonably equivalent" in value to the continued participation of the stockholders; 3) "necessary" to the reorganization; and 4) a "fresh" contribution to the reorganization.  *Case*, 308 U.S. at 122, 60 S.Ct. at 10.  The present Plan fails to satisfy several of these criteria.

■ While the Bank's arguments primarily center on the form and substantiality of the contribution and its reasonable equivalence to the retained partnership interest, the most troubling aspect of the Plan is that the contributions are not "necessary" to the reorganization.[10]

■ For new value to be considered "necessary," it must be "necessary to the effective reorganization of the debtor."  *In re SLC Limited V*, 137 B.R. 847 (Bankr. C.D.Utah 1992); *In re Tallahassee Associates, L.P., supra; In re Woodscape Ltd. Partnership, supra.*  The partners' contri-

bution, the bulk of which will be used to partially satisfy the Bank's $3,800,000 unsecured claim, will not enhance the Debtor's prospects for effective reorganization.

Of the $135,000 which is offered by the partners, $120,000 is payable directly to the Bank while only $15,000 will be contributed to the Debtor's reorganization efforts.[11]  The partial payment of a pre-existing debt to an objecting creditor, particularly in such an insignificant amount, will not facilitate the reorganization.  *Accord In re Mortgage Invest. Co. of El Paso, Texas, supra* (where infusion of capital was to be used for payment of class of creditors, infusion not necessary to continued operations of debtor).

■ Partial payment of a pre-petition debt might be necessary to the reorganization where the money is paid to a creditor with whom the Debtor needs to continue a relationship to ensure successful reorganization.  For example, if the partners' contribution were to be applied to an outstanding debt owed to a creditor who provides, on a continuing basis, a good or service which is integral to the continued operation of the Debtor, it is conceivable that that payment might be "necessary to the effective reorganization of the Debtor."  Here, the Bank provides no service to the Debtor which is vital to the continued operation of the business.  At best, partial payment of the Bank's debt will only stave off immediate liquidation, but it will not facilitate reorganization.

---

**9.** Moreover, continued application of the new value exception comports with the policy underlying Chapter 11 reorganizations.  The purpose of Chapter 11 is to successfully rehabilitate the Debtor.  *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 527, 104 S.Ct. 1188, 1196, 79 L.Ed.2d 482 (1984).  The new value exception is an equitable principle judicially created to preserve the property which is subject to the reorganization.  In many instances, only the shareholders will have the resources and inclination to contribute capital to the reorganized entity.  Without preservation of the property through those contributions, the bankrupt estate would likely be forced to liquidate in lieu of reorganizing.  Encouraging reorganization rather than liquidation can also benefit creditors.  In the event of a liquidation, many creditors would go uncompensated or undercompensated on their claims.  However, where the Debtor is given the opportunity

to continue business operations under a plan of reorganization, there is a greater likelihood that the creditors can recoup all or at least a larger portion of their claim as the business continues to generate income over the life of the plan.

**10.** The Bank's brief focuses more extensively on the substantiality of the contribution.  Many of the Bank's arguments in regard to substantiality are applicable to the court's decision regarding necessity since the issue of the substantiality of the contribution is often intertwined with the question of its necessity.  *In re Mortgage Invest. Co. of El Paso, Texas*, 111 B.R. 604, 619 (Bankr. W.D.Tex.1990).

**11.** As discussed *infra*, the value of the cash flow guarantee is not part of the new value contribution.

Furthermore, even if the contribution by the partners were "necessary to an effective reorganization," the Plan fails to satisfy other requirements as set forth in *Case, supra.*

■ For example, to qualify under the new value exception, a contribution must be in "money or money's worth." *Case,* 308 U.S. 106, 122, 60 S.Ct. 1, 10; *Ahlers, supra.* The bankruptcy court concluded that the cash flow guarantee had a value, and, therefore, the guarantee constituted a contribution of new value "in money's worth." While the cash flow guarantee may be valuable to the Debtor as a safeguard against potential cash shortfalls, the present guarantee is not a contribution "in money's worth" which comports with the stringent requirements for application of the new value exception.

■ A new capital investment must be a present contribution, taking place at or before the effective date of the plan, not a contribution in the future. *In re Hendrix,* 131 B.R. 751, 753 (Bankr.M.D.Fla.1991); *In re Yasparro,* 100 B.R. 91, 97 (Bankr. M.D.Fla.1989); *In re Stegall,* 85 B.R. 510, 514 (C.D.Ill.1987) *aff'd,* 865 F.2d 140 (7th Cir.1989). A present contribution is essential so that it may be liquidated by the creditors should the reorganization effort fail. *In re Stegall,* 85 B.R. at 515. Here, the cash flow guarantee pledged by the general partners is contingent on future events and is too amorphous to be properly included as part of the new value contribution. *See In re 47th and Belleview Partners,* 95 B.R. 117 (Bankr.W.D.Mo.1988) (general partner's guarantee of cash shortfalls lacked "certainty, at the time of approval of the plan," and was not contribution in "money or money's worth"). There is no assurance that the cash flow guarantee will ever be transformed into cash which will aid in the reorganization of the Debtor.

■ The bankruptcy court modified, *sua sponte,* the cash flow guarantee arrangement by directing that the entire guarantee

be placed in escrow in an interest bearing account, "to ensure that there has been a true contribution." [12] The escrow arrangement does not add new value in money's worth to the reorganization venture. The detriment incurred by the partners in placing funds into an escrow account does not result, per se, in a contribution of "new value" to the reorganized Debtor. As the Seventh Circuit has observed, "A guarantee may be costly to the guarantor, but it is not a balance-sheet asset, and it therefore may not be treated as new value." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1363 (7th Cir. 1990).

■ The focus of the new value exception is on the effect of the contributed funds on the Debtor's reorganization. By requiring a deposit of funds into the escrow account, the bankruptcy court only ensured that the guarantors have the funds to support their guarantee. The escrow arrangement does not ensure that the escrowed funds will ever become part of the Debtor's reorganization efforts. As the guarantee cannot be new value because it is contingent upon the occurrence of future events, the release of the funds placed in escrow is likewise contingent upon future events and, hence, the contribution to the escrow account cannot be considered "new value." Moreover, the Bank could not liquidate the escrow funds in the event of the collapse of the reorganized Debtor since the Bank does not exercise control over the funds.[13]

■ Hence, it was error to include the cash flow guarantee as part of the new value contribution, and the value of the total contribution must be adjusted accordingly. Hence, the total value of the contributions made by the equity holders, found by the bankruptcy court to be $200,000, must be reduced by $65,000, the value attributed to the cash flow guarantee. The total contribution by the equity holders for

---

**12.** The Bank challenges the bankruptcy court's ability to make this modification; however, as stated, *supra,* at note 4, the court will refrain from comment on that issue.

**13.** The necessity of those escrowed funds to the reorganization of the Debtor is also questionable, since the funds may never reach the reorganized entity.

purposes of application of the new value exception is, therefore, $135,000.

■ Furthermore, the infusion of $135,000 is not "substantial" to permit application of the new value exception.[14] As the bankruptcy court noted, the "substantiality" of the contribution is measured by considering its size, its relation to the plan's distribution to unsecured creditors, its relation to unsecured claims against the estate, and its relation to a normal market contribution. *In re Sherwood Square Assoc.,* 107 B.R. 872 (Bankr.D.Md.1989).

The $135,000 contribution represents only 3.6% of the unsecured claim of the Bank. Courts have held that contribution-to-unpaid debt ratios greater than the one at present are not substantial. *In re Pullman Construction Industries, Inc., supra* (contribution of 2% to 4% not substantial); *In re Ashton,* 63 B.R. 244 (Bankr.D.N.D. 1986) (4.3% ratio unsubstantial). Furthermore, assuming the accuracy of the bankruptcy court's estimate that the partners' retained interest in the Debtor equals $215,000, the retained interest exceeds the $135,000 contribution by nearly 37%. In light of disproportionality between the contribution and the outstanding debt and the disparity between the contribution and the retained property interest, the contribution is not sufficiently substantial to allow the Debtor to avail itself of the new value exception.

CONCLUSION

For all of the foregoing reasons, the Order of the bankruptcy court confirming the Debtor's Sixth Amended Plan of Reorganization will be reversed and the matter remanded for disposition in accordance with the terms of this Memorandum and Order.

---

**14.** The court is mindful that only $15,000 will actually go to the Debtor's reorganization efforts; nevertheless, even assuming that the entire $135,000 were allocated to the reorganization efforts, $135,000 is not a substantial contribution.