**In re GRAPHIC COMMUNICATIONS, INC., Debtor.**

**Bankruptcy No. 95–48150–R.**

United States Bankruptcy Court,
E.D. Michigan,
Southern Division.

Sept. 4, 1996.

Paul Dillon, Plymouth, MI, for Debtor.

Thomas Beck, Livonia, MI, for Creditor.

## AMENDED SUPPLEMENTAL OPINION REGARDING CONFIRMATION

STEVEN W. RHODES, Chief Judge.

The debtor seeks confirmation of its plan of reorganization. One creditor, Midwest Graphics, Inc., has objected to confirmation on the grounds that the plan unfairly discriminates against Midwest and violates the absolute priority rule.[1] This opinion supplements a decision given on the record in open court.

### I.

Midwest holds an unsecured, non-priority claim of approximately $68,900 against the debtor arising out of two business loans made in 1980. In the late 1970s, Midwest and the debtor contemplated forming a joint venture. Midwest moved into the debtor's premises and for a period of time the two entities attempted to operate side by side. It was, in the words of the state court judge who later presided over these parties' subsequent dispute, "a very loose arrangement." The merger never took place, and sometime in 1979 the parties had a falling out.

Subsequent to the falling out, however, Midwest made two loans to the debtor. In the first loan, on February 14, 1980, the debtor executed a promissory note to Midwest for $3,100 plus interest, due May 14, 1980. Then on March 28, 1980, the debtor executed a promissory note to Midwest for $3,500 plus interest, due April 28, 1980. The debtor used the funds to pay operating expenses.

The debtor never repaid the loans, and so Midwest sued the debtor for the amount due. Midwest also sued for an order that 250 shares of the debtor's stock be issued to Midwest. Previously, Midwest had purchased the stock in lieu of paying rent to the debtor while the two shared space. The debtor had never reissued those shares to Midwest.

In January of 1990, judgment was entered against the debtor for the principal amounts in the notes plus interest and for the issuance of the stock. In the state court proceeding that culminated in that judgment, the debtor's principal, George King, testified that he had no intention of repaying Midwest at the time he signed the notes. King reiterated that intent during a deposition taken in this bankruptcy case, adding that he had not informed Midwest of his intent at the time the loans were made.

Midwest and the debtor engaged in negotiations over satisfaction of the state court judgment but nothing came to fruition. In June of 1995, Midwest garnished the debtor's bank account. The debtor objected to the garnishment and the matter was set for hearing on August 4, 1995. The debtor filed its bankruptcy petition August 4, 1995.

The debtor's plan of reorganization groups creditors into five classes. Class I consists of the allowed secured claim of CIT Group. Class II consists of the allowed priority and secured claims of federal, state, and local taxing authorities.[2] Class III consists of the unsecured claims of the debtor's general trade creditors, and is impaired. Class IV consists of the unsecured claims of the shareholders of the debtor. Midwest's claim is in Class IV, along with the unsecured claims of George King. Class IV is also impaired.

Balloting resulted in acceptances from two Class III creditors and a rejection from Midwest. Therefore, Class III accepted the

---

1. Additionally, Midwest asserts that the debtor has not proposed its plan in good faith. 11 U.S.C. § 1129(a)(3). However, in light of the resolution of the other issues, it is unnecessary to address this issue.

2. No party raised any issue concerning this aspect of the debtor's plan.

plan, and Class IV rejected the plan.[3] *See* 11 U.S.C. § 1126(c).

Class V is the equity class. Presently, the debtor's stock is held by King, Midwest, and another individual shareholder. The shares are split 37,500, 250, and 250 respectively. Midwest thus holds approximately two-thirds of one percent of the debtor's stock. Under the debtor's plan, the existing stock will be extinguished.

Finally, the plan provides that King will make a cash contribution to the reorganized debtor, for which he will receive 100% ownership of the reorganized debtor.[4] King has personally guaranteed this contribution. The contribution is intended to cover deficiencies in the debtor's cash flow. At the confirmation hearing, counsel for the debtor estimated the contribution at $15,000.

## II.

### A.

Initially, Midwest objects to the classification of its claim, contending its claim is substantially similar to those in Class III and that its claim should either be included in that class or receive the same treatment as that class. Midwest suggests that the debtor improperly segregated Midwest's claim in Class IV in order to create an assenting impaired class in Class III.

The debtor responds that Midwest's claim is not substantially similar to the claims in Class III. According to the debtor, Midwest became a creditor of the debtor because of Midwest's close business relationship with the debtor. The debtor characterized Mid-

west's claims as the claim of an investor and/or a shareholder-creditor, maintaining that it is entirely permissible to separate creditors on this basis.

Moreover, the debtor argues that even if Midwest's claim is not found to be substantially different from the claims in Class III, § 1122(a) does not prohibit the segregation of similar claims, requiring only that claims that are classified together be similar. At the confirmation hearing, Midwest contended § 1122(a) should be read to require that substantially similar claims must be grouped together. Midwest also argues that there is no sound business reason for the separation of its claim.

### B.

Section 1122(a) provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."

Plainly read, § 1122(a) does not require that similar claims be placed in the same class. *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co., Inc. (In re U.S. Truck Co., Inc.)*, 800 F.2d 581, 585 (6th Cir.1986). *See also Olympia & York Fla. Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 879–80 (11th Cir.1990) (Plan proponent has wide, although not unlimited, discretion to classify creditors); *In re Jersey City Medical Ctr.*, 817 F.2d 1055, 1060–61 (3d Cir.1987) (Bankruptcy judges have wide discretion in finding classifications rational).

---

**3.** It is not clear from the record whether, and if so how, George King voted. It is ultimately irrelevant, given Midwest's vote to reject. *See* 11 U.S.C. § 1126(c) (a class has accepted a plan if it is accepted by creditors that hold "more than one-half in number of the allowed claims of such class").

**4.** The debtor's plan contains the following provision:

> *Equity of the Debtor.* In order to facilitate the payment of claims and interests as set forth herein, and to enhance the possibility of successful reorganization of the debtor, George King shall continue to contribute his time, experience, and knowledge to the day-to-day operations of GCI. Moreover, King shall con-

> tribute to the corporation, on or before the payments called for in Article 2, ¶ B above, the amount necessary to fulfill said payment obligation to the extent the corporation is unable to fulfill said obligation. It is currently estimated, based on cash available as shown in Exhibit C–1, that King will contribute between $10,000 and $20,000 to satisfy these obligations. Said payment shall be in the nature of new value which shall be consideration for the issuance of One Hundred (100) shares of common stock and shall represent the new shareholder equity in the Corporation.

Debtor's Proposed Plan of Reorganization, Art. 2, ¶ C.

■ Further, separate classification of unsecured creditors is permissible when there is a sound business justification for doing so. *U.S. Truck,* 800 F.2d at 587 (Upholding separate classification of labor union based on such entity's "non-creditor" interests in reorganization); *Frito–Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.),* 10 F.3d 944, 956–57 (2d Cir.1993) (Allowing separate classification of tax lessors on the basis of whether they independently provided financing to debtor in possession); *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter., Ltd., II (In re Briscoe Enter., Ltd., II),* 994 F.2d 1160, 1167 (5th Cir.), *cert. denied,* 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993) (Permitting separate classification of creditor who contributed cash to subsidize rentals in moderate to low income housing).

### C.

■ In this case, there is a rational business reason for the separate classification of Midwest's claim. Unlike the Class III trade creditors, Midwest is a competitor of the debtor and is not currently doing business with the debtor. It is not necessary that the debtor remain in good standing with Midwest in order to continue operations. Additionally, the origin and nature of Midwest's claim distinguishes it from the Class III claims. Midwest made the loans to the debtor because of their close business relationship at the time. The debtor needed money to pay operating expenses. This is somewhat different from the usual situation with trade creditors who advance goods and services that the debtor needs to operate.

Accordingly, the classification of Midwest's claim is not inappropriate and there is no violation of § 1122(a).

### III.

### A.

Next, Midwest argues that the plan unfairly discriminates against Midwest by proposing to pay only 10% to Midwest while paying 100% to the other unsecured creditors in Class III. Midwest argues that it loaned the debtor money which the debtor used for business expenses, just as the Class III creditors provided goods and services to the debtor which the debtor used in the business. Therefore, Midwest maintains, its claim is comparable to those in Class III and it is inherently unfair to pay Midwest 10% while all other trade claimants receive 100% payment.

The debtor maintains that it is reasonable to pay only 10% to Midwest because Midwest's claim is not based on trade debt like the other claims in Class III. The debtor argues that at the time Midwest's claim arose, Midwest was in a position to exert "substantial influence" over the debtor's operation and that it is reasonable under the circumstances to treat Midwest's claim in the nature of equity. The debtor also asserts that providing equal treatment, i.e., 100% payment, to both Class III and Midwest would be burdensome and jeopardize successful reorganization. Full payment to Class III is necessary, according to the debtor, in order to conduct business post-confirmation. Additionally, the debtor notes, the plan's treatment of Midwest would give Midwest value equal to what it originally loaned to the debtor.

### B.

■ Section 1129(b)(1) of the Bankruptcy Code provides that if all applicable requirements of 11 U.S.C. § 1129(a) are met, the Court must confirm the debtor's plan "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The debtor, as proponent of its plan, bears the burden of proof. *In re S.A.B.T.C. Townhouse Ass'n Inc.,* 152 B.R. 1005, 1008 (Bankr.M.D.Fla. 1993); *In re Montgomery Ct. Apts. of Ingham County, Ltd.,* 141 B.R. 324, 346 (Bankr. S.D.Ohio 1992).

Essentially, an impaired class who rejects a plan must be treated fairly and equitably, and must "receive treatment which allocates value to the class in a manner consistent with the treatment afforded to the other classes with similar legal claims against the debtor." 5 *Collier on Bankruptcy* ¶ 1129.03[3][b] at

1129–81 (Lawrence P. King ed., 15th ed. 1996).

A four-factor analysis is used to determine whether the debtor's plan unfairly discriminates against Midwest by proposing 10% payment to Midwest and 100% payment to all other unsecured creditors. The first factor is whether the discriminating treatment is reasonable. The second factor is whether the debtor could carry out a plan that does not so discriminate. The third factor is whether the plan containing the discriminating treatment is proposed in good faith. The final factor is the actual treatment of the discriminated class. *In re Rochem Ltd.*, 58 B.R. 641, 643 (Bankr.D.N.J. 1985); *Creekstone Apts. Assoc., L.P. v. Resolution Trust Corp. (In re Creekstone Apts. Assoc., L.P.),* 168 B.R. 639, 644–45 (Bankr. M.D.Tenn.1994).

A plan may reasonably discriminate if the "proposed discrimination "protect[s] a relationship with specific creditors that the debtor need[s] to reorganize successfully." *Creekstone Apts.,* 168 B.R. at 644. In *Creekstone Apts.,* cited by the debtor, a creditor argued the debtor's plan unfairly discriminated by proposing a 10% payment to the creditor on its unsecured claim while paying 80% on the effective date and 20% over time to unsecured claims in another class. The debtor attempted to prove to show that the discrimination protected valuable business relationships with its trade creditors; the objecting creditor argued that because those trade creditors held recourse claims against the general partner, whatever the debtor could not pay could be collected from the general partner, so there was no need for the debtor to pay those claims in full. After considering the testimony of the debtor's general partner and a manager, the court found that "if the debtor itself, as a separate business entity, failed to payoff [sic] these vendors in full, the debtor's future creditworthiness and credibility with these and other potential vendors would be jeopardized." *Id.*

Discriminatory treatment may also be reasonable if premised on the basis of the claims in question. In the *Rochem* case, an unsecured creditor alleged it was unfairly discriminated against in the debtor's plan, which proposed to pay that particular creditor $50,000 on a $35 million claim while general unsecured trade claimants in a different class were to receive 50% of their claims. The objecting creditor was a tort claimant whose claim was unliquidated and disputed. On that basis, the *Rochem* court found it was appropriate to treat the objecting creditor differently from general trade creditors. *Rochem* at 643–44.

Similarly, in *In re 11,111 Inc.,* 117 B.R. 471 (Bankr.D.Minn.1990), cited by the debtor, two equity security creditors who were to receive nothing under the debtor's plan argued they were improperly excluded from the class of general unsecured claimants receiving 40%. One of the equity security creditors had made an initial capital contribution to the debtor and the other had made a loan to the debtor which gave him an option of acquiring shares of the debtor's stock. Both equity security creditors were also either an officer, director, or employee of the debtor. The court determined the discrimination was not unfair on the basis that the two equity security creditors were clearly insiders of the debtor and clearly *not* trade debt claimants like the other general unsecured creditors. *11,111 Inc.,* 117 B.R. at 478. In addition, the court found not only that both equity security creditors were aware of the debtor's financial condition and that they were putting their money at risk, but that each was "in a unique position to influence the ongoing financial and business operations of the debtor." *Id.*

## C.

The Court concludes that the debtor has failed to demonstrate that the discrimination against Midwest is reasonable. First, the discrimination against Midwest cannot be justified on the basis of the origin of the claim. The distinction may be sufficient to support separate classification but is insufficient to support the disparate treatment between the Class III creditors and Midwest. Contrary to the debtor's arguments, this case stands in stark contrast to *11,111 Inc.* Midwest owns only a small percentage of the

debtor's stock, and has never been in a position of influence over the debtor's financial and business affairs. In fact, Midwest has often been at a disadvantage in its relationship with the debtor. At one point, the debtor converted Midwest's telephone number in a telephone directory advertisement and appropriated Midwest's business. Additionally, testimony from the state court proceedings indicates that George King may have induced Midwest to make the loans through false representations. There is no indication that Midwest wielded any power or influence over the debtor's financial and business operations. The plan's discrimination against Midwest cannot be justified by the reasoning in *11,111 Inc.*

Second, the debtor has not demonstrated that its treatment of Midwest's claim is necessary to successfully reorganize, or that it could not carry out a plan of reorganization that did not discriminate between Class III and Class IV. The debtor has offered no substantiation for the alleged necessity of paying 100% to all Class III creditors. Nor has the debtor justified why its plan cannot provide for more equal treatment of Classes III and IV.

Third, the circumstances of this case suggest the discriminatory treatment of Class IV furthers George King's personal animosity against Midwest. King testified on more than one occasion that he did not intend to repay the money owed to Midwest at the time the loan was made. Indeed, King has managed to avoid repayment for 15 years. Antipathy toward a creditor is not proper basis for discrimination. *See In re Baugh,* 73 B.R. 414, 417 (Bankr.E.D.Ark.1987).

Finally, the plan's actual treatment of Midwest is to pay 10% of Midwest's claim, which is close to the amount Midwest originally loaned the debtor. The debtor maintains it is sufficient that Midwest will receive the amount of its original investment. However, Midwest has spent 15 years attempting to recover its loan. The debtor's plan does not offer Midwest a meaningful recovery.

Therefore, the Court concludes that the debtor has failed to justify the significantly disparate treatment between Class III and Midwest. Accordingly, confirmation is denied on the grounds that the debtor's plan fails to satisfy 11 U.S.C. § 1129(b)(1).

## IV.

### A.

■ Midwest also argues that the debtor's plan violates the absolute priority rule.

The debtor's plan proposes to extinguish the current equity interests. At the same time, Mr. King, who is majority shareholder with 37,500 shares, will contribute approximately $15,000 in exchange for 100% ownership of the reorganized debtor. The contribution is personally guaranteed by Mr. King and is intended to cover any shortages in the debtor's cash flow.

Midwest argues that it is impermissible for Class IV claimants to receive only 10% payment while Mr. King not only retains his interest in the debtor but becomes sole owner. Midwest also argues that Mr. King is not contributing reasonably equivalent value in exchange for sole ownership because the debtor had $414,428 in sales through August of 1995 and a net income of $39,995. Further, Midwest argues that as principal and sole shareholder, Mr. King can pay himself any salary he wants and would be able to recover his $15,000 investment whenever he chooses.

The debtor contends that Mr. King's $15,000 contribution satisfies the new value exception to the absolute priority rule. According to the debtor, the contribution of approximately $15,000 is substantial, citing the debtor's loss of about $45,000 in the two months since filing chapter 11, the risky nature of the printing business, and the debtor's need for new equipment. Further, the debtor argues that the contribution is necessary to fund the plan.

The absolute priority rule is found at § 1129(b)(2)(B), which states:

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

### B.

The first problem with the debtor's plan is that a pre-petition owner, Mr. King, will receive or retain an interest in the debtor "on account of" that ownership interest. This issue was addressed in the recent case of *In re Trevarrow Lanes, Inc.*, 183 B.R. 475 (Bankr.E.D.Mich.1995) (Spector, J.). That well reasoned opinion addressed the applicable Supreme Court and Sixth Circuit precedent and came to this conclusion:

> [T]he rule is clearly violated if the post-confirmation ownership rights are attributable in whole or in part to the fact that the owner is a former shareholder. One could reasonably infer that such is the case is the amount of the contribution proposed in the reorganization plan is substantially less than the market value of the participation right, unless there is some other plausible explanation for the value/price discrepancy.

*Trevarrow*, 183 B.R. at 489.

After declining to rule on the valuation issue, Judge Spector concluded:

> A second and subtler way of skirting the absolute priority rule is to grant shareholders some kind of edge over other parties vis-a-vis acquisition of an ownership interest in the reorganized entity. If, for example, only shareholders are afforded the opportunity to make the requisite contribution in exchange for such an interest, then it generally is safe to assume that this opportunity—and, ultimately, the ownership interest itself—is in recognition of shareholder interests. This "stock warrant," so to speak, offends the principle of absolute priority because it represents something of value—a property interest—

that is given to shareholders *qua* shareholders, notwithstanding the fact that creditors are to receive less than full payment on their claims.

*Trevarrow*, 183 B.R. at 490.

Judge Spector then rejected the debtor's plan because there was no evidence that parties other than pre-petition shareholders were offered an opportunity to purchase the debtor's stock. Thus, the shareholders did receive an interest in the debtor "on account of" their pre-petition ownership interest, in violation of § 1129(b)(2)(B).

The same conclusion must be reached in the present case. There is simply no evidence that anyone other than Mr. King was offered any opportunity to participate in the ownership of the reorganized debtor.

### C.

The second problem with the debtor's plan is that there is no evidence that Mr. King's contribution is reasonably equivalent to the interest King will receive. Although Judge Spector declined to rule on this issue in *Trevarrow*, the lack of evidence on this issue in this case cannot be overlooked.

 The reasonable equivalence requirement ensures that equity holders will not get around the absolute priority rule by offering token cash contributions. *See Montgomery Ct. Apts.*, 141 B.R. at 345. An important factor in determining whether the new cash contribution is reasonably equivalent to the future participation is the value of the reorganized debtor. *Id.* In *Montgomery Ct. Apts.*, the debtor failed to produce any evidence on the "reorganization value." The court stated, "Evidence is essential to establish that the value of the future participation in the reorganized debtor is reasonably equivalent to the new cash contributed." *Id.* at 345–46. The debtor failed to present evidence of the reorganized debtor's value, and the court concluded that the plan could not be confirmed. *Id.* at 346. *See also S.A.B.T.C. Townhouse Ass'n Inc.*, 152 B.R. at 1011 (Confirmation denied where the debtor failed to prove that new value was reasonable equivalent of interest being received; debtor failed to provide any information regarding

the aggregate value of the equity holders' retained interest in the reorganized entity, as well as any evidence of "reorganization" value).

Similarly in this case, the debtor offered no evidence of its value after its reorganization. This leaves the Court without a means to compare Mr. King's contribution to the value of the interest that he will receive. As a consequence, Mr. King will not be permitted to receive an ownership interest in the debtor to the detriment of a creditor such as Midwest. Therefore, confirmation is also denied on the ground that there is no evidence of the value of the reorganized debtor.

### D.

■ The third problem with the debtor's plan is that the contribution proposed by Mr. King is legally insufficient, regardless of the value of the reorganized debtor. The plan proposes that Mr. King personally guarantee a shortage in the debtor's cash flow, estimated at $15,000.

In *In re Sovereign Group 1985–27, Ltd.*, 142 B.R. 702, 709 (E.D.Pa.1992), the court found it was error to include a cash flow guarantee as part of a new value contribution. According to that court, "[a] new capital investment must be a present contribution, taking place at or before the effective date of the plan, not a contribution in the future." *Id.* at 709. In that case, a cash flow guarantee pledged by the debtor's general partners was found to be contingent on future events and "too amorphous" to be considered part of the new value contribution. *Id.* Further, the court found there was "no assurance that the cash flow guarantee will ever be transformed into cash which will aid in the reorganization of the [d]ebtor." *Id.*

Similarly, in *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, the Seventh Circuit rejected the argument that a guaranteed future cash infusion constituted new value. The court stated that guarantees are no different from promises of future labor and skilled, experienced management. *Kham & Nate's*, 908 F.2d at 1362 (*quoting Norwest Bank Worthington v. Ahlers*, 485 U.S. at 204, 108 S.Ct. at 967). In *Kham & Nate's*, the debtor's two principals sought to retain their equity interests even though the debtor's creditors were not to be paid in full, by guaranteeing new loans made as part of the reorganization. The bankruptcy judge had allowed this on the grounds that the guarantees were new value.

The Seventh Circuit disagreed. According to the court,

> Guarantees are ... intangible, inalienable, and unenforceable.... [The two principals] may revoke their guarantees or render them valueless by disposing of their assets; although a lender may be able to protest the revocation, the debtor cannot compel the guarantor to maintain the pledge in force. Guarantees have "no place in the asset column" of a balance sheet. We do not know whether these guarantees have the slightest value, for the record does not reveal whether [the two principals] have substantial unencumbered assets that the guarantees would put at risk. If [the two principals] were organizing a new firm in Illinois, they could not issue stock to themselves in exchange for guarantees of loans. Illinois requires the consideration for shares to be money or other property, or "labor or services actually performed for the corporation[.]" So [they] could subscribe for shares against a promise of labor, but the firm could not issue the shares until the labor had been performed. A guarantee does not fit into any of the statutory categories, and there is no reason why it should. One who pays out on a guarantee becomes the firm's creditor, a priority higher than that of stockholder. A guarantor who has *not* paid has no claim against the firm. Promises inadequate to support the issuance of shares under state law are also inadequate to support the issuance of shares by a bankruptcy judge over the protest of creditors, the real owners of the firm.

*Id.*

The reasoning of Judge Easterbrook in *Kham & Nate's* is persuasive and applicable here. First, in its provision for Mr. King to guarantee deficiencies in the debtor's cash flow, the plan does not commit Mr. King to any particular contribution. Indeed, there is

no certainty here that Mr. King will make a specific contribution. There is no evidence that this promise to make up differences in the debtor's cash flow has any value whatsoever. Midwest further suggests that there is no reason why Mr. King, as principal and controlling shareholder, could not recoup any contribution made whenever he so chooses. Although this is mere speculation, the suggestion demonstrates how nebulous the proposed contribution is.

Accordingly, Mr. King's guarantee to contribute some approximate amount of money in the future to cover the debtor's operating expenses cannot be considered reasonably equivalent value.

## V.

For the foregoing reasons, confirmation of the debtor's plan of reorganization is denied.