## In re REALTY INVESTMENTS, LTD. V, a Texas Limited Partnership, Debtor.

### Bankruptcy No. LA 86–07001–GM.

United States Bankruptcy Court, C.D. California.

April 8, 1987.

As Amended June 19, 1987.

Joseph A. Eisenberg, Levene & Eisenberg, Charles W. West, Los Angeles, Cal., for debtor-in-possession.

Harvey L. Leiderman, Gregory L. Germain, Landels, Ripley & Diamond, San Francisco, Cal., George H. Tilton, Jr., Denver, Colo., for creditor, Kinnickinnic.

## MEMORANDUM OF OPINION RE DENIAL OF CONFIRMATION OF DEBTOR'S PROPOSED CHAPTER 11 PLAN

GERALDINE MUND, Bankruptcy Judge.

The Confirmation of the proposed plan propounded by the debtor-in-possession came on for hearing on February 19, 1987, at 2:00 o'clock P.M. in Courtroom "G" of the above entitled Court, the Honorable GERALDINE MUND, presiding. Joseph A. Eisenberg, Esq. and Charles W. West, Esq. appeared on behalf of the debtor-in-possession; Harvey L. Leiderman, Esq., Gregory L. Germain, Esq., and George H. Tilton, Esq. appeared on behalf of Kinnickinnic Realty Company, the Class 5 creditor. The Court, having considered the objections and having reviewed the proposed plan found that the plan was not subject to confirmation because of inherent defects and denied confirmation.

## FACTS OF THE CASE

Realty Investments Ltd. V (hereinafter "Realty Investments" or "debtor") is a Texas limited partnership formed on October 20, 1978 for the purpose of owning and operating the United Bank Building in Pueblo, Colorado. Kinnickinnic Realty Company (hereinafter "KK") sold this building to the debtor in December, 1978 for $4,625,000.00: part cash, part assumption of the existing first and second deeds of trust, and the balance as a non-recourse third deed of trust.

This bankruptcy is one of a series of some eighty cases which were filed in this court (with approximately another forty being filed in other courts across the country). These bankruptcies are loosely referred to as the "Tatco cases" because either Tatco or G.C. Cole Corporation is the general partner of each individual limited partnership. Each limited partnership owns as its single asset a piece of commercial real property. The properties are spread across the United States.

Prior to the filing of this bankruptcy, the debtor had defaulted on its obligation to KK (which was now in the position of holder of the second deed of trust). KK had obtained a state court receiver, who remained in place throughout the bankruptcy, collecting the rents, paying the first deed of trust, paying most post-petition bills and property taxes, and transmitting the balance of the rents to KK.

Some months ago KK filed an action for relief from the automatic stay and presented to the Court an undisputed appraisal in the amount of $3,000,000.00, which was less than the amount owed the holder of the first deed of trust. Although there was no equity for the debtor, because of the possible cramdown provisions and other tools given to a debtor in Chapter 11 and because of the receiver being in place, the Court honored the debtor's request that it be allowed a reasonable length of time to file a disclosure statement and plan.

### THE PROPOSED PLAN

The debtor clearly admits that it has structured its proposed plan so as to cramdown KK and effectively "redeem" the property from KK's lien without any payment whatsoever. In order to do this, the plan is based on the presumption that the fair market value of the property is $3,000,-000.00. The property is to be sold to American Resource Corporation (hereinafter "ARC"). The total amount to be transferred by ARC is approximately $3,215,003.00 in cash and assumption of liens plus 300 shares of ARC stock (which have not been valued by the Court, but which the parties contend do have value). The debtor then apportions the consideration as follows: $70,122.00 will go to pre-petition tax liens on the property; $3,071,903.00 consists of the assumption of the first deed of trust with Massachusetts Mutual Life; approximately $8,000.00 will be used to pay off all administrative claims; $15,664.00 will be used to refund tenant deposits; $100.00 will pay the claim of Colonial Service Corporation (holder of the third deed of trust and a controlled corporation of G.C. Cole); $50,000.00 will be a "pot" to be distributed prorata to general unsecured claims; and each equity security holder of the debtor will receive one share of ARC stock for every $1,000 of capital contribution to the debtor partnership. KK will receive the "allowed amount of its secured claim," which debtor contends is zero.

Certain issues of ownership of ARC were raised and the debtor specified that Sherman Mazur held both an interest in the debtor and in the buyer. The actual relationship between the various parties was never clearly determined. Because of this the Court questioned whether the transfer to ARC was truly a "sale." However because the Court felt that it would be more efficient to look at other issues first, the question of the relationship between buyer and seller was delayed and has not been determined at this time.

### SECTION 1111(b) ELECTION

KK wished to make an election under 11 U.S.C. § 1111(b) to treat its non-recourse obligation as fully secured. Because of this the debtor structured the plan as a "sale" and requested that the Court determine that KK was denied its right to elect because the property was being sold under the plan. The Court struggled with the language of Section 1111(b)(1)(B)(ii) which apparently differentiates between the rights of a non-recourse creditor and of a recourse creditor when the property is to be sold under the plan.[1] Despite the apparent confusion in language, the legislative history makes it clear that if the property is being sold under a Chapter 11 plan, a non-recourse creditor will have its claim reduced to the allowed secured claim as provided by Section 506(a), will lose its unsecured claim, and can be left unimpaired if its allowed secured claim is paid in full on the effective date of the plan. *In re DRW Property Co. 82* (Bankr.N.D.Tex. 1986), 57 B.R. 987.

Therefore if this is truly a sale of the property under the plan, KK loses its right to elect under § 1111(b) and also loses any unsecured claim for the deficiency and cannot vote in the unsecured class.

---

1. 11 U.S.C. § 1111(b)(1)(B) states as follows: "(B) A class of claims may not elect application of paragraph (2) of this subsection if—
   (i) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

## VALUE OF THE PROPERTY

A key issue that must be determined is the value of the property. The debtor seeks to hold the creditor to the $3,000,000 value that it put forth in the action for relief from stay. The creditor has now come in with a higher appraisal.

■ A debtor may not argue that because the creditor has undervalued the security in a relief from stay proceeding, the creditor can be compelled to subordinate its claim to inferior obligations of the debtor. 11 U.S.C. § 506(a); *In re Karl J. Krueger, Jr.* (Bankr.S.D.Fla.1986), 66 B.R. 463, 15 B.C.D. (CRR) 16; *In re Ahlers* (8th Cir. 1986), 794 F.2d 388, 399.

The somewhat unique issue presented in this plan is not the fact that the creditor now seeks to put in a higher appraised amount than it presented to the Court at the relief from stay hearing some months ago, but that the Court needs to value the property based upon the terms of the plan itself.

This plan provides for an allegedly arms length sale of the property to ARC for a total consideration of $3,215,003.00 plus 300 shares of ARC stock. Although the debtor argued that certain other intangibles were being transferred to ARC (such as the use of the name of the debtor), the Court found that this is not the case. The Court finds that the total consideration paid by ARC is for the real property and therefore the value of the real property in issue as set forth in this plan is $3,215,003.00 plus 300 shares of ARC stock (or the equivalent value thereof). In fact, whatever consideration ARC would give to purchase the property is its "value" and therefore KK should receive some payment under the plan.

In determining how these various code provisions fit together, the Court must now decide whether KK is bound by the determination of value created by ARC's offer or whether there are other rights that will protect KK from a questionable sale at a very low price. This is where Section 363(k) applies.

## EFFECT OF SECTION 363(k)

■ The Bankruptcy Code reflects the intent of Congress to give a non-recourse secured creditor the right to credit bid on the property and take the property in lieu of its claim. 15 *Collier on Bankruptcy,* ¶ 1111.02 (15th Ed. 1985).

■ The language of Section 1111(b)(1)(B)(ii) seems to indicate that if the property is being sold under the plan, the undersecured creditor is not entitled to its right to credit bid, as this right is contained in Section 363(k). However, the legislative history makes it clear that the rights of section 363(k) attach to sale of property under the plan: "Sale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k) of the House amendment." 124 Cong.Rec. H 11104 (Daily Ed. Sept. 28, 1978); 124 Cong. Rec. S 17420 (Daily Ed. Oct. 6, 1978).

An argument might be made that the "allowed claim" referred to in the Congressional Record is only the secured portion of KK's claim. But this is an argument of form and not of substance.

■ Until KK is paid in full, any bid received is subject to overbid by KK. If ARC's bid were valued at $3,300,000.00, KK could overbid it, and KK's bid would then become, by definition, the "allowed" claim. Because KK is a non-recourse creditor, it is practical that KK will bid in its entire obligation and therefore that is its "allowed" claim. Because no one could buy the property without KK's consent, unless KK is paid in full, the "allowed claim" of KK must (for purposes of credit bidding), be its total claim without reference to the "value" of the property.

Since KK has indicated its intent to credit bid and take the property, confirmation of this plan would be an exercise in futility.

## THIS PLAN DOES NOT MEET OTHER REQUIREMENTS OF CONFIRMATION

■ However, even if KK had decided not to credit bid (and there is no written

notice that it will do so), this plan cannot be confirmed over the rejecting vote of KK. This is both on the grounds that the plan does not meet the liquidation analysis test of section 1129(a)(7), and that it fails to comply with the requirements of section 1129(a)(8).

Section 1129(a)(7) requires the Court to give the property of the debtor a liquidation value as of the effective date of the plan and to determine that a dissenting creditor receives or retains under the plan no less than the amount that it would receive or retain if the debtor were liquidated.

Section 1129(a)(8), in conjunction with Section 1129(b), allows the debtor to "cramdown" the secured creditor so long as the secured creditor receives the indubitable equivalent of its claim or receives at least the value of its interest in the estate's interest in the property. The other possible cramdown provisions do not apply to these facts.

As noted above, of the consideration paid, $73;764 plus the ARC shares will go to classes which are subordinate to KK. Therefore KK is not receiving the full value of its secured claim and is impaired. Its consent is necessary or the debtor must meet the cramdown provisions. Because the debtor is seeking to apportion some of the value of the property to classes which are subordinate to KK, KK is not receiving the value of its lien nor the indubitable equivalent of its claim and therefore cannot be forced to accept this plan.

Because the plan seeks to change distribution requirements of the Bankruptcy Code without the consent of the secured creditor, this plan violates sections 1129(a)(3), (a)(7), and (a)(8). For the above stated reasons, confirmation of this plan is denied.

As the motion previously brought for relief from stay was denied solely on the ground that the property was necessary to an effective reorganization of the debtor, and it appears to the Court that no effective reorganization of the debtor is feasible, relief from stay is hereby granted to KK to proceed with its state remedies to enforce its lien.

The foregoing memorandum of opinion shall be the findings of fact and conclusions of law in this case.