**In re SUNCRUZ CASINOS, LLC**
**Jab America, Inc., Debtors.**

Nos. 01–24661–BKC–PGH,
01–24662–BKC–PGH.

United States Bankruptcy Court,
S.D. Florida,
Broward Division.

Sept. 8, 2003.

Arthur H. Rice, Esq, Miami, FL, for debtors.

Robert M. Abramson, Scott Baena, Miami, FL, Michael R. Bakst, L. Louis Mrachek, West Palm Beach, FL, Jim H. Boyd, Fayetteville, AR, Ladd C. Brown, Planta-

tion, FL, Guy E. Burnette, Jr., Tallahassee, FL, Vaughn A. Carney, Colchester, VM, Stephen F. Chiccarelli, Baton Rouge, LA, Rob T. Cook, Islamorada, FL, Allison R. Day, Miami, FL, Louis T. DeLucia, Princeton, NJ, Charles H. Dittmar, Tampa, FL, Theodore R. Doran, Aaron R. Wolfe, Daytona Beach, FL, Aurelio Durana, Coral Gables, FL, Max G. Factor, Tallahassee, FL, Manuel Farach, West Palm Beach, FL, Wendell Finner, Jacksonville Beach, FL, James L. Fly, Richard A. Robinson, Orlando, FL, R. Mark Fore, Lakeland, FL, John H. Genovese, Luis Salazar, Miami, FL, Michael I. Goldberg, Douglas R. Gonzales, Marc J. Gottlieb, Bryan S. Greenberg, Beth–Ann E. Herschaft, Robert L. Jennings, Andrew H. Kessler, Andrew D. Zaron, Ft. Lauderdale, FL, Robert C. Gross, Robert Harris, Miami, FL, M. Lewis Hall III, Sarasota, FL, Eric L. Hearn, Jacksonville, FL, Fredrick C. Heidgerd, Deerfield Bch., FL, Andrew B. Hellinger, Miami, FL, Shari L. Heyen, Houston, TX, Roman B. Hirniak, Princeton, NJ, L. Joseph Hoffman, Coral Gables, FL, Alejandro F. Hoyos, Jefferson P. Knight, John W. Kozyak, Miami, FL, Claudio E. Iannitelli, Phoenix, AZ, Camille J. Iurillo, Dennis J. LeVine, Patrick T. Lennon, Jacob J. Munch, Laura E. Prather, Hendrik Uiterwyk, Tampa, FL, Mitchell E. Jacobs, Robert C. Meyer, Steven Mishan, Mindy A. Mora, Daniel Morman, Timothy J. Norris, Arthur R. Rice, Miami, FL, James O. Johnston, Los Angeles, CA, Kenneth M. Jones, Plantation, FL, Daniel J. Leeper, St. Petersburg, FL, Anthony Leon, Tarpon Springs, FL, Steven N. Lippman, Thomas J. McCausland, Thomas M. Messana, Arthur C. Neiwirth, Ivan J. Reich, Reggie David Sanger, Patrick S. Scott, Ft. Lauderdale, FL, Corali Lopez–Castro, Miami, FL, John A. Moffa, Sunrise, FL, Will Murphy, Margaret Villella, Hollywood, FL, C. Robert Murray, Coral Gables, FL, Larry Mark Polsky, Daytona Beach, FL, Nicholas V. Pulignano Jr., Chad S. Roberts, Jacksonville, FL, Jonathan I. Rothstein, Daytona Beach, FL, David R. Softness, Robert E. Stone, Walter J. Tache, Andrew L. Waks, Miami, FL, Stephen M. Weinstein, Hollywood, FL, for creditor.

Jessica L. Wasserstrom, Miami, FL, for trustee.

### MEMORANDUM OPINION SUSTAINING SECURED LENDERS' OBJECTIONS TO AND DENYING CONFIRMATION OF DEBTORS' SECOND AMENDED PLAN OF REORGANIZATION

PAUL G. HYMAN, JR., Bankruptcy Judge.

This matter came before the Court upon the Debtors' Second Amended Plan of Reorganization, (the "Plan"), and the objections thereto asserted by Foothill Capital Corporation and Citadel Equity Fund Ltd. (collectively, the "Secured Lenders"). At the conclusion of the August 14, 2003 hearing on certain motions for appointment of a trustee filed by the Secured Lenders and the U.S. Trustee, the Court scheduled a pretrial conference in advance of the September 17–19, 2003 confirmation hearing, for the purpose of determining certain legal issues regarding the confirmability of the Plan under 11 U.S.C. § 1129. The Court directed the parties to file memoranda of law to address those issues. On August 29, 2003, memoranda of law were filed by the Secured Lenders in opposition to the Plan (joined by Jack Abramoff), and by the Debtors and certain insider entities owned and controlled by the probate estate of Konstantinos "Gus" Boulis (the "Boulis Entities") in support of the Plan.

The Court, after reviewing the Plan and the memoranda of law filed by the Secured Lenders, the Debtors, and the Boulis Enti-

ties, and otherwise being fully advised in the premises, held a hearing on September 2, 2003, at which the Court issued an oral ruling denying confirmation of the Plan and sustaining the Secured Lenders' objections thereto.[1] For the reasons set forth herein, as well as for those reasons stated on the record at the September 2, 2003 hearing, the Court holds that the Plan cannot be confirmed, and sustains five of the objections raised by the Secured Lenders in their memorandum of law. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### ISSUES PRESENTED

The following issues were presented to the Court to be determined prior to the confirmation hearing on the Plan:

(i) Whether the Plan can separately classify the Foothill Deficiency Claim;[2]

(ii) Whether the Secured Lenders may credit bid their entire claim, including the unsecured deficiency portion of that claim, at the proposed sale under the Plan;

(iii) Whether the value to be contributed by NODI and WIC under the Plan, consisting of market value leases for the dock and parking in Hollywood, Florida, is illusory;

(iv) Whether the proposed contribution by the Boulis creditors of their rights, if any, to the tradename "SunCruz" is permitted under the Intercreditor and Subordination Agreement before the Secured Lenders have been paid in full;

(v) Whether the Plan appropriately applies the postpetition adequate protection payments made by the Debtors to the Secured Lenders by reducing the Secured Lenders' allowed secured claim by some or all of those payments;

(vi) Whether the Secured Lenders are disqualified from a section 507(b) superpriority administrative expense claim because they did not move for relief from the automatic stay; and

(vii) Whether the claims of GKB Holdings, LLC and the other Sellers, arising under the Seller Note and the Mezzanine Note, can be satisfied as provided for in the Plan even though payments are to be made to unsecured creditors ahead of classes of creditors holding the Seller and Mezzanine Notes, in light of the terms of the Intercreditor and Subordination Agreement and the absolute priority rule.

### DISCUSSION

**I. The Plan Improperly Classifies the Secured Lenders' Purported Unsecured Deficiency Claim Separately from the Claims of General Unsecured Creditors**

The Plan classifies the purported unsecured deficiency claim of the Secured Lenders (in Class 2A) separate from the

---

**1.** Present at the September 2, 2003 hearing were: counsel for the Debtors, counsel for the Secured Lenders, counsel for the Boulis Entities, counsel for the Official Committee of Unsecured Creditors, and the Assistant United States Trustee. At the commencement of the September 2 hearing, the Court asked whether any party objected to the issuance of an oral ruling at that hearing rather than at the pretrial conference scheduled for September 5, 2003; no party objected.

**2.** Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Plan.

other claims of general unsecured creditors (in Class 6). This is improper.

■ 11 U.S.C. § 1122(a) provides in pertinent part that:

> [A] plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

While the statute itself deals only with the requirement that dissimilar claims may not be classified together, courts have uniformly held that it also prohibits separate classification of similar claims unless supported by legitimate business reasons. *E.g., Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Road Ltd. Partnership)*, 21 F.3d 477, 483 (2d Cir. 1994); *In re New Midland Plaza Assocs.*, 247 B.R. 877, 893 (Bankr.S.D.Fla.2000).

In determining whether a plan may classify an undersecured creditor's deficiency claim separately from other general unsecured claims, the overwhelming majority of courts have not allowed dissimilar treatment or voting distinctions based on separate classification. These courts reject separate classification as an impermissible attempt to "gerrymander" classes to create an impaired class of claims that will vote in favor of the plan in order to satisfy section 1129(a)(10), which requires at least one impaired accepting class to confirm a plan. *See Boston Post Road Ltd. Partnership v. FDIC (In re Boston Post Road Ltd. Partnership)*, 21 F.3d 477, 483 (2d Cir. 1994), *cert. denied,* 513 U.S. 1109, 115 S.Ct. 897, 130 L.Ed.2d 782 (1995); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 161–62 (3d Cir.1993); *Travelers Ins. Co. v. Bryson Props., XVIII (In re Bryson Props., XVIII)*, 961 F.2d 496, 502 (4th Cir.1992), *cert. denied,* 506 U.S. 866, 113 S.Ct. 191, 121 L.Ed.2d 134 (1992); *Lumber Exch. Bldg. Ltd. Partnership v. Mutual Life Ins. Co.*

*of N.Y. (In re Lumber Exch. Bldg. Ltd. Partnership)*, 968 F.2d 647, 649–50 (8th Cir.1992); *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture)*, 995 F.2d 1274, 1279–81 (5th Cir.1991); *Hanson v. First Bank of South Dakota, N.A.*, 828 F.2d 1310, 1313 (8th Cir.1987); *In re National/Northway Ltd. Partnership*, 279 B.R. 17, 25–29 (Bankr.D.Mass.2002); *In re Holley Garden Apts., Ltd.*, 223 B.R. 822, 824–25 (Bankr.M.D.Fla.1998); *In re Equitable Dev. Corp.*, 196 B.R. 889, 892–93 (Bankr. S.D.Ala.1996); *In re Harry Dean & Samuel Carson*, 166 B.R. 949, 952–54 (Bankr. D.N.M.1994); *In re D & W Realty Corp.*, 165 B.R. 127, 128–30 (S.D.N.Y.1994); *In re Austin Ocala Ltd.*, 152 B.R. 773, 775–76 (Bankr.M.D.Fla.1993); *In re Roswell–Hannover Joint Venture*, 149 B.R. 1014, 1018–22 (Bankr.N.D.Ga.1992); *In re 499 W. Warren St. Assocs., Ltd. Partnership*, 151 B.R. 307, 312–13 (Bankr.N.D.N.Y. 1992); *266 Washington Assocs. v. Citibank, N.A. (In re Washington Assocs.)*, 147 B.R. 827, 831–32 (E.D.N.Y.1992); *In re Main Road Props., Inc.*, 144 B.R. 217, 219–21 (Bankr.D.R.I.1992); *In re Stoneridge Apartments*, 125 B.R. 794, 796 (Bankr.W.D.Mo.1991); *In re Valrico Square Ltd. Partnership*, 113 B.R. 794, 795 (Bankr.S.D.Fla.1990) (Weaver, J.); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819, 828–30 (Bankr.S.D.N.Y.1982). *See also generally* 7 COLLIER ON BANKRUPTCY ¶ 1122.03[6][a], at 1122–22 (15th ed. rev. 2003) (stating "[g]enerally, courts have rejected classifications based on apparent attempts to 'gerrymander' claims so as to create an impaired class that will vote in favor of a plan of reorganization. In this context, a majority of circuits have held that unsecured deficiency claims created under section 1111(b) cannot for this sole reason be classified separately from other unsecured claims").

Though the Eleventh Circuit Court of Appeals has not decided the specific issue of whether an unsecured deficiency claim may be classified separately from general unsecured claims, it has articulated the standard cited below. This standard has been followed by lower courts in the Eleventh Circuit (cited above) in holding that deficiency claims *cannot* be separately classified:

> Although the proponent of a plan of reorganization has considerable discretion to classify claims and interests according to the facts and circumstances of the case, this discretion is not unlimited. "There must be some limit on a debtor's power to classify creditors ... The potential for abuse would be significant otherwise." If the plan unfairly creates too many or too few classes, if the classifications are designed to manipulate class voting, or if the classification scheme violates basic priority rights, the plan cannot be confirmed. *Olympia & York Florida Equity Corp. v. Bank of New York (In re Holywell Corp.)*, 913 F.2d 873, 880 (11th Cir.1990) (quoting *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co.*, 800 F.2d 581, 586 (6th Cir.1986)) (other citations omitted).

Debtors' Pre–Confirmation Brief offers the following reasons as grounds for separate classification of the Foothill Deficiency Claim: (i) the Secured Lenders' election rights under section 1111(b), (ii) the litigation by and against the Secured Lenders which could affect the priority and amount of the Secured Lenders' claim against the Debtors, and (iii) the Secured Lenders' purported different motivations for voting

on the Plan. At the September 2, 2003 hearing, Debtors' counsel stated that the Debtors were asserting no reasons for the separate classification of the Foothill Deficiency Claim other than those set forth in the Debtors' Pre–Confirmation Brief.

The Court finds that the reasons articulated by the Debtors are insufficient business reasons to support the separate classification of the Foothill Deficiency Claim as a matter of law. Accordingly, the Court holds that the Plan's separate classification of the Foothill Deficiency Claim is impermissible.

## II. *The Plan Improperly Limits the Secured Lenders' Ability to Credit Bid their Entire Claim, Including any Purported Unsecured Deficiency*

The Plan purports to provide a mechanism by which the Debtors' assets will be offered for sale at the confirmation hearing. Although the Plan is silent on the point, the Disclosure Statement indicates that the Debtors will attempt to limit the ability of the Secured Lenders to credit bid at that sale to the amount of their "allowed secured claim." Disclosure Statement § 6.1(8). This limitation on credit bidding is improper.

11 U.S.C. § 363(k), which provides for a secured creditor's right to credit bid at a sale,[3] provides as follows:

> (k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such

---

**3.** Though the statute expressly applies to sales under Section 363(b), the legislative history clarifies that the right to credit bid also applies to sales under a Chapter 11 plan. *See* 124 CONG. REC. H 11104 (Daily Ed. Sept. 28, 1978) (statement of Rep. Edwards) (stating

"[s]ale of property under section 363 or under the plan is excluded from treatment under section 1111(b) because of the secured party's right to bid in the full amount of his allowed claim at any sale of collateral under section 363(k)").

holder may offset such claim against the purchase price of such property.

▮ The term "allowed claim" in section 363(k) makes no distinction between secured and unsecured claims. Further, 11 U.S.C. § 101(5) defines a "claim" as, among other things, a "right to payment, whether or not such right is ... secured, or unsecured." Accordingly, the plain language of the statute makes clear that the secured creditor may credit bid its *entire claim,* including any unsecured deficiency portion thereof.

The legislative history of section 363(k) further clarifies that a secured creditor may credit bid the entire amount of its claim. *See* 124 CONG. REC. H 11093 (Daily Ed. Sept. 28, 1978) (statement of Rep. Edwards) (stating "a secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof in the event the creditor is undersecured")

Collier on Bankruptcy explains the secured creditor's right to credit bid as follows:

The right of the creditor to offset its claim is of significant value. It enables a creditor to purchase property, often without having to part with new funds. The creditor may bid-in an amount up to its entire claim; the offset is not limited to any previously determined secured claim. Thus, the right is unaffected by any prior valuation under section 506(a) that may have divided an allowed claim into an allowed secured claim and an allowed unsecured claim due to a perceived lack of collateral value. If the creditor purchases the property, the allowed unsecured claim may be bid in its entirety as long as it would have been secured but for the valuation under section 506(a).

3 COLLIER ON BANKRUPTCY ¶ 363.09, at 363–60.12 (15th ed. rev. 2003) (footnotes omitted).

Courts have held that a secured creditor may credit bid the entire amount of its claim, including the unsecured portion thereof. *See In re Midway Invs., Ltd.,* 187 B.R. 382, 391 (Bankr.S.D.Fla.1995) (holding "section 363(k) provides the right to credit bid the full amount of the claim"). In *In re Realty Invs., Ltd. V,* 72 B.R. 143 (Bankr.C.D.Cal.1987), the court discussed the purpose of allowing a secured creditor to credit bid the entire amount of its claim rather than just the allowed secured portion:

An argument might be made that the "allowed claim" referred to in the Congressional Record is only the secured portion of KK's claim. But this is an argument of form and not of substance.

Until KK is paid in full, any bid received is subject to overbid by KK. If ARC's bid were valued at $3,300,000.00, KK could overbid it, and KK's bid would then become, by definition, the "allowed" claim. Because KK is a non-recourse creditor, it is practical that KK will bid in its entire obligation and therefore that is its "allowed" claim. Because no one could buy the property without KK's consent, unless KK is paid in full, the "allowed claim" of KK must (for purposes of credit bidding), be its total claim without reference to the "value" of the property.

72 B.R. at 146

The Plan's attempt to limit the Secured Lenders' right to credit bid contravenes the plain language of section 363(k) and its legislative history, and therefore is improper.

### III. *The Proposed "New Value" Contribution of Market Rate Leases is Illusory*

Under the Plan, the Debtors seek to discharge tens of millions of dollars of

secured and unsecured claims at cents on the dollar, while retaining all of the equity in the reorganized debtor in insider affiliates of the current insider owners. The lynchpin of the Plan is the purported contribution of "new value" consisting of "market rate leases" for a dock and parking lots in Hollywood, Florida, and the waiver of any purported claims to the "SunCruz" name.

6024 North Ocean Drive, Inc. ("NODI"), one of the Boulis Entities, is an insider that owns the dock in Hollywood, Florida, for which the Debtors currently are subtenants. Disclosure Statement Art. IV.H. NODI claims the right to evict the Debtors from the dock. *Id.* The Boulis Entities apparently have refrained from exercising that alleged right to evict the Debtors, and instead have purportedly permitted the Debtors to remain in possession of the leasehold on a month-to-month basis and, under the Plan, agree to continue to lease the dock (and related parking lots owned by insider Whale Inlet Corporation— "WIC"—another of the Boulis Entities) if, and only if, the Court confirms the Plan.

The "lease" contribution that comprises half of the "new value" under the Plan is this: "NODI as the owner of the real property generally referred to as the 'Hollywood Location' will enter into a lease with the Reorganized Debtors for a minimum of three years with two 1–year options at fair market value.... Further, WIC shall provide leases to the Reorganized Debtors for the parking lots used by the Debtors for the same time frames as NODI will provide a dock lease so that the Debtors' rights to use the dock and parking lots are *co-terminus.*" Disclosure Statement § 5.37.

■ Setting aside both the problems regarding lack of specificity of the proposed "new value" and the Boulis Entities' conflict of interest, an agreement to lease property "at fair market value" is not "new value." In fact, this "new value" is illusory.

A lease under which rent is payable at a market rate provides no "value". "The trustee finds in his sound business judgment that the lease has no realizable value for the benefit of the bankruptcy estate, because the rent is at the market rate." *In re Plitt Amusement Co.,* 233 B.R. 837, 840 (Bankr.C.D.Cal.1999); *see also, In re Ames Dep't Stores, Inc.,* 287 B.R. 112, 118 (Bankr.S.D.N.Y.2002) (holding that leases may have value, but only where the rent "has fallen to below-market"). If the provision of a "market rate" lease was adequate "new value," then all of the Debtors' lessors would be entitled to share in the equity of the reorganized debtor.

■ Moreover, even assuming that there exists a "new value" exception to the absolute priority rule,[4] and that the agreement to lease property somehow comprises some "value," this purported value is not sufficient, as a matter of law, to justify the distribution of new equity as set forth in the Plan. Specifically, as the U.S. Supreme

---

**4.** The Supreme Court repeatedly has declined to decide whether the "new value" exception survived enactment of the Bankruptcy Code. Whenever it has been faced with the question, it has held that, even if the exception did survive, it was not satisfied on the facts before it. *See, most recently, Bank of America Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 445–58, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). If the new value exception exists, it is unlikely that the insiders' purported contribution of "new value" here satisfies the exception because, among other things, it appears that the "contribution" is not new, is not necessary to the reorganization, is not substantial, is not reasonably equivalent to the interest being received, and is not open to valuation by the market.

Court has held, a "new value" contribution must "be in cash or be realizable for money's worth." *203 North LaSalle,* 526 U.S. at 454, 119 S.Ct. 1411. This "money or money's worth" standard means the following:

> Assuming arguendo that there is a "new value exception" to absolute priority, new value must be a present contribution rather than a promise to pay in the future, it must be freely tradeable in the market by the debtor and it must be an asset in the accounting sense.
>
> > *In re Miami Center Assocs., Ltd.,* 144 B.R. 937, 942 (Bankr.S.D.Fla. 1992)

*See Norwest Bank v. Ahlers,* 485 U.S. 197, 204, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988) (contribution not "money or money's worth" because "[i]t has no place in the asset column of the balance sheet of the new [entity]") (quoting *Case v. Los Angeles Lumber Prods.,* 308 U.S. 106, 122–23, 60 S.Ct. 1, 84 L.Ed. 110 (1939)). Additionally, "[t]he contributor must also bear an economic risk of loss." *In re Yasparro,* 100 B.R. 91, 97 (Bankr.M.D.Fla.1989) (citing *In re Potter Material Service, Inc.,* 781 F.2d 99, 103 (7th Cir.1986)).

A "market rate" lease meets none of these criteria. It is not a "present contribution" of anything. It is not "freely tradeable in the marketplace." It is not an "asset in the accounting sense." The Boulis Entities are not bearing any "economic risk of loss." To the contrary, if anything, the purported "contribution" is a liability of the reorganized debtor. Put another way, the "market rate" leases are a vehicle for the Boulis Entities to be paid by the reorganized debtor on an ongoing basis, while transferring ownership in the reorganized debtor to those very same insiders. The cases uniformly condemn "win-win" schemes like this. *Cf. In re S.A.B.T.C. Townhouse Ass'n,* 152 B.R.

1005, 1009–10 (Bankr.M.D.Fla.1993) ("Strict adherence to the requirements is important to safeguard against a sham 'new contribution' which would infringe upon the rights of creditors to a debtor's property values.").

In *Tucson Self–Storage,* the Ninth Circuit BAP held that, even a cash loan to the reorganized debtor is not "new value":

> The alleged new value is in reality a loan to Tucson pledged by its assets. There was no present contribution of new value. Instead, Tucson was merely adding another liability to its balance sheet that must be repaid from the accumulated earnings of the reorganized debtor. In fact, Tucson's shareholders are bearing no cost, risk, or burden, while pledging Tucson's assets to receive principal and interest payments for the next 15 years.
>
> > *Oxford Life Ins. Co. v. Tucson Self–Storage, Inc. (In re Tucson Self–Storage, Inc.),* 166 B.R. 892, 899 (9th Cir. BAP 1994) (footnote omitted);

*Accord, Sunflower Racing, Inc. v. Mid–Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.),* 226 B.R. 673, 691 (D.Kan.1998) ("Hollywood Park also apparently fails to meet the new value exception because it is not making a substantial capital contribution to the Debtor pursuant to the plan. Under the plan, Hollywood Park simply would loan approximately $3 million to the Debtor during the initial two year period of the plan. Hollywood Park would be repaid all amounts it advanced under the Plan. The infusion of cash by way of loan generally will not satisfy the new value exception to the absolute priority rule.").

Similarly, in *Miami Center,* the Court held that, despite the fact that the insiders were contributing $2 million in cash, there was no "new value" because the insiders ultimately would reap the benefit of that contribution:

In essence, from the debtor's perspective, the proposed new value is like putting money in the bank. The debtor's principals put the money in, and presumably the value of the hotel will increase which inure to the benefit of the debtor's principals (who may "withdraw" the increased value by selling the property in the future). In the meantime, the secured creditor, who bargained for a first lien position, runs the ultimate risk of the project's failure with no upside potential. Such a result is not fair and equitable and violates the absolute priority rule. *Miami Center*, 144 B.R. at 942.

*See also, In re Graphic Communications, Inc.*, 200 B.R. 143, 152 (Bankr.E.D.Mich. 1996) (no "new value" exists where "there is no reason why Mr. King, as principal and controlling shareholder, could not recoup any contribution made whenever he so chooses"); *In re Rocha*, 179 B.R. 305, 309 (Bankr.M.D.Fla.1995) ("[T]he prospect of placing a mortgage on property of the estate to secure Plan payments, does not satisfy the new value exception .... The granting of the mortgage does not inject anything of new value into the estate. Additionally, according to the Debtors' Disclosure Statement, there is no equity in the property. Not only is the mortgage not new value, it is not value at all. The Debtors have not contributed anything of value that would be marketable by the creditor. The Supreme Court's dictate in *Ahlers* was that the new value must be something of present value exchangeable by the creditor in the market today. A

mortgage placed on property in which the Debtors do not have any equity is not value, and it is not new value coming from an outside source.").

And, in *S.A.B.T.C. Townhouse,* there was no "new value" where the insiders collected accounts receivable owed to the debtor and promised to contribute the funds upon confirmation. *S.A.B.T.C. Townhouse,* 152 B.R. at 1010 ("this Court is not fooled"). In *8315 Fourth Avenue,* there was no "new value" where the insiders were to guarantee and collateralize payments under the plan. *In re 8315 Fourth Avenue Corp.,* 172 B.R. 725, 737–39 (Bankr.E.D.N.Y.1994). In *Yasparro,* there was no "new value" where the contribution consisted of promissory notes delivered to the debtor. *Yasparro,* 100 B.R. at 98.

Here, the promised "market rate" leases have no value. Certainly there is not sufficient value to support the issuance of new shares. As such, the "market rate" lease cannot be "new value." *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1362 (7th Cir.1990) ("Promises inadequate to support the issuance of shares under state law are also inadequate to support the issuance of shares by a bankruptcy judge over the protest of the creditors, the real owners of the firm.").[5]

### IV. *The Proposed "New Value" Contribution of Alleged Rights to the "SunCruz" Name is Illusory*

■ The other component of the purported "new value" that the Debtors claim entitles the Boulis Entities to retain all the equity while cramming down the Plan is

---

**5.** In the Disclosure Statement, the Debtors made a "no harm, no foul" argument, contending that the value of equity in the reorganized debtor was minimal so the "new value" contribution only needed to be negligible. Disclosure Statement, § 7.2. The Supreme Court has rejected this type of argument: "We join with the consensus of authority

which has rejected this 'no value' theory. Even where debts far exceed the current value of assets, a debtor who retains his equity interest in the enterprise retains 'property'" and therefore needs to satisfy the rigors of the "new value" exception (assuming it exists). *Ahlers,* 485 U.S. at 207–08, 108 S.Ct. 963.

the agreement by the Boulis Entities to "release their Claim for the use of the SunCruz name in the Debtors' current areas of operation." Disclosure Statement §§ 5.37, 7.3. The alleged rights to the name purportedly arise due to nonpayment of obligations relating to the Boulis Entities' sale of assets (including the name) to the Debtors prior to bankruptcy, which the Boulis Entities now assert entitle them to rescind the sale and to take back the name. *Id.* § 4.46. Notably, the insiders refuse to release their purported claim to use of the name outside of the Debtors' "current areas of operation," reserving for themselves the right to compete with the Debtors elsewhere. The insiders also purport to grant themselves complete releases of claims of any and all creditors, including claims in the non-bankruptcy lawsuits currently pending against them. *See* Disclosure Statement § 5.37; Plan, § 16.1.

Even assuming that the Boulis Entities in fact have a claim to the "SunCruz" name that theoretically has value, the purported contribution—via a waiver of their alleged rights to the name—is illusory. This is because, under the Intercreditor and Subordination Agreement dated as of September 21, 2000, by and between the Secured Lenders, the Debtors, GKB Holdings, LLC and certain of the other Boulis Entities, and Adam Kidan and Jack Abramoff (the "Subordination Agreement"), the Boulis Entities are expressly prohibited from asserting any rights in or claims to the "SunCruz" name until such time as the Secured Lenders are paid in full (which the Plan does not do).

The Secured Lenders' claims are defined as "Senior Indebtedness" in the Subordination Agreement. The claims of the Boulis Entities are defined as "Junior Indebtedness," and the Boulis Entities are defined as "Junior Secured Creditors."

The term "Collateral" is defined to include all of the Debtors' "presently existing and hereafter acquired personal property, including, without limitation ... General Intangibles." "General Intangibles" in turn is defined to include the Debtors' "now owned or hereafter acquired right, title, and interest with respect to general intangibles (including ... goodwill, patents, trade names, trademarks, servicemarks, [and] copyrights ...)."

Section 6(a) of the Subordination Agreement provides that, "until all Senior Indebtedness has been Paid in Full"—"none of the Junior Secured Creditors [*i.e.*, the Boulis Entities] shall accelerate the principal amount due on any Junior Indebtedness or exercise any Secured Creditor Remedies with respect to the Collateral." "Secured Creditor Remedies" in turn include "any action by a Secured Creditor in furtherance of the sale, foreclosure, realization upon, or the repossession or liquidation of any of the Collateral, including, without limitation ... (iv) the exercise of any remedies available to a seller of assets including, without limitation, any rights of forfeiture, recession or repossession of any assets sold by such seller."

Read together, these provisions prohibit the Boulis Entities from taking any action to recover any "Collateral," including any "trade names, trademarks, or servicemarks," until the Secured Lenders are paid in full. If the Boulis Entities nevertheless try to do so, section 7(b) of the Subordination Agreement gives the Secured Lenders the absolute right to intervene to stop them:

> If the Junior Secured Creditors shall attempt any Secured Creditor Remedies or attempt any other action prohibited or restricted under this Agreement, ... the Senior Lenders may interpose as a defense or plea the making of this Agreement and the Senior Lenders may

intervene and interpose such defense in its name . . . or the Senior Lenders may by virtue of this Agreement restrain the enforcement thereof . . . . Subordination Agreement § 7(b).

The Subordination Agreement further states:

> The Junior Secured Creditors agree that they will not directly or indirectly take any action to contest or challenge the validity, legality, perfection, priority, availability, or enforceability of the liens of any Senior Lenders upon the Collateral or seek to have the same avoided, disallowed, set aside, or otherwise invalidated in any judicial proceeding or otherwise.

> Subordination Agreement § 5.

This provision as well precludes the Boulis Entities from trying to recover the Sun-Cruz name, which is part of the Secured Lenders' "Collateral."

All of the provisions of the Subordination Agreement are fully enforceable in this case. The Subordination Agreement expressly provides that "[t]he rights and priorities set forth in this Agreement shall remain binding irrespective of the terms of any plan of reorganization in a Bankruptcy Case or other provisions of the Bankruptcy Code or any similar federal or state statute." Subordination Agreement § 6(b). The Subordination Agreement also "shall continue in full force and effect after the commencement of a Bankruptcy Case." *Id.* § 10(a).

In addition, even absent those provisions, the Subordination Agreement "is enforceable . . . to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a);

---

**6.** In another unsupportable provision of the Plan, the Debtors purport to unilaterally "amend" the Subordination Agreement to the extent that it conflicts with the Plan. Disclosure Statement § 5.6. This is yet another

*Chemical Bank v. First Trust of New York, N.A. (In re Southeast Banking Corp.)*, 179 F.3d 1307 (11th Cir.1999).[6]

As a consequence of the Subordination Agreement, the Boulis Entities have nothing to contribute. Even if they had any claim to the "SunCruz" name, they would be contractually prohibited from asserting that claim until the Secured Lenders are paid in full. The agreement of the Boulis Entities to "waive" that claim is therefore meaningless and valueless.

## V. Proper Application Of Adequate Protection Payments Made To Secured Lenders Cannot Be Determined At This Time

■ Adequate protection payments are intended, first and foremost, to protect against, and compensate for, a decrease in the value of a creditor's collateral. 11 U.S.C. § 361(1); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

> Adequate protection is provided to safeguard the creditor against depreciation in the value of its collateral during the reorganization process. If the value of the collateral decreases, the creditor is entitled to cash payments so that the value of its interest in the collateral remains constant. Thus, the amount by which the collateral depreciates is the amount of adequate protection to which the secured creditor is entitled.

> *First Fed. Bank v. Weinstein (In re Weinstein)*, 227 B.R. 284, 296 (9th Cir. BAP 1998) (citations omitted);

reason why the Plan cannot be confirmed. *Sunflower Racing*, 226 B.R. at 691–94 (plan cannot terminate or modify subordination agreement among creditors).

See *In re 354 East 66th Street Realty Corp.*, 177 B.R. 776, 782 (Bankr.E.D.N.Y. 1995) ("When adequate protection payments are granted, in the event that the value of the collateral decreases, and the secured creditor cannot realize the full value of the collateral to support its claim as of the date of the filing of the petition, it may keep the adequate protection payments since it was intended that these payments protect the secured creditor from loss.").

██ If a creditor is oversecured, adequate protection payments serve as payment of postpetition interest on the oversecured claims. *In re Vest Assocs.*, 217 B.R. 696, 705 (Bankr.S.D.N.Y.1998) ("An oversecured creditor may allocate adequate protection payments to postpetition interest to the extent of its oversecurity."); *accord, Fremont Fin. Corp. v. Izzo (In re Rack Eng'g Co.)*, 212 B.R. 98, 104 (Bankr. W.D.Pa.1997).

██ Adequate protection payments are applied to reduce the principal of a fully secured creditors' claim if, and only to the extent that, those payments "exceed the decrease in value of the collateral," plus any postpetition interest accrued during the time in which the creditor was oversecured. *John Fabick Tractor Co. v. Maun (In re Maun)*, 95 B.R. 94, 96 (Bankr. S.D.Ill.1989); *see also Weinstein*, 227 B.R. at 296.

"[I]f the collateral does depreciate, the application of adequate protection payments to payment obligations under the plan [*i.e.*, to reduction of the secured claim] would give the debtor 'double credit' and would deny the creditor the compensation to which it is entitled." *Confederation Life Ins. Co. v. Beau Rivage Ltd.*, 126 B.R. 632, 639 (N.D.Ga.1991).

In this case the Court has not made any findings, nor has there been any evidence presented valuing Secured Lenders' collateral as of the petition date, or subsequent thereto. The value of the collateral is an open question of fact still to be determined. Consequently, the Court is unable to make any determination regarding the appropriate application, either to interest or to principal, of the cash collateral payments that have been made to Secured Lenders. Accordingly, Secured Lenders' objection to confirmation on grounds that the Plan misapplies adequate protection payments cannot be determined at this time.

**VI. Secured Lenders' Claim To Entitlement Of A Superpriority Section 507(B) Claim Cannot Be Determined At This Time**

In *Carpet Center*, the Eleventh Circuit stated, "section [507(b)] provides that when adequate protection has been given to a secured creditor and later proves to be inadequate, the creditor becomes entitled to a superpriority administrative expense claim to the extent that the proffered adequate protection was insufficient." *Bonapfel v. Nalley Motor Trucks (In re Carpet Center Leasing Co.)*, 991 F.2d 682, 685 (11th Cir.1993). *See Grundy Nat'l Bank v. Rife*, 876 F.2d 361, 363–64 (4th Cir.1989) (" § 507(b) converts a creditor's claim where there has been a diminution in the value of a creditor's secured collateral by reason of a § 362 stay into an allowable administrative expense claim under § 503(b)"); 4 COLLIER ON BANKRUPTCY ¶ 507.12, at 507–87 (15th ed. rev.2003) ("this priority claim is for the loss or shortfall not covered by adequate protection").

The Secured Lenders' object to confirmation, among other reasons, on grounds that the Plan fails to provide a superpriority § 507(b) claim for diminution in the

value of the Secured Lenders' collateral. As discussed above, the value of the collateral is an open question of fact yet to be determined. Consequently, just as Secured Lenders' objection based upon the Plan's alleged misapplication of adequate protection payments cannot be determined at this time, the objection based upon the Plan's omission of Secured Lenders' alleged entitlement to a superpriority § 507(b) claim cannot be determined at this time.

## VII. *The Plan's Treatment of the Boulis Insider Notes Violates the Subordination Agreement*

▇ The Boulis Entities hold $67.5 million in secured claims against the Debtors. Disclosure Statement § 4.11. Although, pursuant to the Subordination Agreement, these claims are subordinated to the prior payment in full of the claims of the Secured Lenders, they nevertheless are secured claims, and therefore they are senior in priority to the claims of general unsecured creditors. In the event that the collateral securing these subordinated claims is fully encumbered by the Secured Lenders' senior lien, these claims would be included in the class of General Unsecured Claims under the Plan (Class 6), where they would be entitled to share *pari passu* in distributions to that class.

The Plan, however, purports to discharge the secured claims of the Boulis Entities with no distributions whatsoever, while making sizable distributions to junior classes of unsecured creditors. Plan §§ 4.3, 4.4, 4.6 and 4.7.[7]

The Boulis Entities apparent "consent" to this treatment is irrelevant because the Subordination Agreement expressly precludes the Boulis Entities from agreeing to impair their claims:

> So long as any of the Senior Indebtedness shall remain outstanding, none of the Junior Secured Creditors will, without the prior written consent of the Senior Lenders:
>
> (i)(A) ... cancel or otherwise discharge any Junior Indebtedness ..., or (B) subordinate any Junior Indebtedness to any indebtedness of any Borrower other than the Senior Indebtedness.
>
> Subordination Agreement § 14(c).

Moreover, the Subordination Agreement gives the Secured Lenders the right to take all action to enforce the claims of the Boulis Entities in the bankruptcy case, including by objecting to the Plan:

> (b) In any Bankruptcy Case by or against any Borrower or any Guarantor,
>
> (i) the Senior Lenders may, and are hereby irrevocably authorized and empowered ... to (A) demand, sue for, collect and receive every payment or distribution referred to in this Section 2.2. and give acquittance therefor and (B) file claims and proofs of claim in respect of the Junior Indebtedness and take such other action (including, without limitation, voting the Junior Indebtedness or enforcing any security interest or other lien securing payment of the Junior Indebtedness) as the Senior Lenders may deem necessary or advisable ...; and
>
> (ii) each Junior Secured Creditor will duly and promptly take such action as

---

7. The Debtors do not merely "discharge" this debt. Rather, they purport that it never existed by treating the discharge "as an adjustment to the purchase price" of the transaction that gave rise to the claims in the first place, thereby purporting to eliminate cancellation of indebtedness income that otherwise would accrue to the Boulis Entities. Plan §§ 4.3, 4.4. The Debtors also try to use the consent of the Boulis Entities to this treatment as a basis for providing the third-party releases in favor of the Boulis Entities. *Id.*

the Senior Lenders may reasonably request (A) to collect the Junior Indebtedness for the account of the Senior Lenders and to file appropriate claims or proofs of claim with respect thereto, (B) to execute and deliver to the Senior Lenders such powers of attorney, assignments or other instruments as the Senior Lenders may request in order to enable it to enforce any and all claims with respect to, and any security interests and other liens securing payment of, the Junior Indebtedness, and (C) to collect and receive for the account of the Senior Lenders any and all payments or distributions which may be payable or deliverable upon or with respect to the Junior Indebtedness. *Id.* § 2.2(b).

Thus, the Plan cannot simply waive the claims of the Boulis Entities without the consent of the Secured Lenders. The Plan's treatment of the Boulis Insider Notes therefore violates the Subordination Agreement,[8] and is yet another reason why the Plan cannot be confirmed.

### CONCLUSION

For all of the foregoing reasons, as well as for the reasons stated on the record at the September 2, 2003 hearing, the Court holds that the Plan cannot be confirmed. The Court sustains five of the Secured Lenders objections to the Plan. However the Court finds that Secured Lenders remaining objections, which are based upon the Plan's application of adequate protection payments and upon the Plan's omission of a superpriority claim for the benefit of Secured Lenders resulting from alleged diminution in the value of the collateral, cannot be decided at this time.

8. The Plan also appears to violates the Subordination Agreement by providing for the Boulis Entities to receive a distribution on their purported $6 million unsecured claim.

### ORDER

For the reasons set forth herein, as well as for those reasons stated on the record at the September 2, 2003 hearing, the Court, having reviewed the Plan, the submissions of the parties, the applicable law, and otherwise being fully advised in the premises, hereby

**ORDERS** and **ADJUDGES** that:

1. Confirmation of the Plan is **DENIED**, and the confirmation hearing scheduled to be held on September 17–19, 2003 is cancelled;

2. Five of Secured Lenders' objections to the Plan are **SUSTAINED**, the sustained objections are that:

   (a) the Plan improperly classifies Secured Lenders purported deficiency claim separately from the claims of general unsecured creditors,

   (b) the Plan improperly limits the Secured Lender's ability to credit bid their entire claim, including any purported unsecured deficiency,

   (c) the Plan's proposed "new value" contribution of market rate leases is illusory,

   (d) the Plan's proposed "new value" contribution of alleged rights to the "SunCruz" name is illusory,

   (e) the Plan's treatment of the Boulis Insider Notes violates the Subordination Agreement;

3. Two of Secured Lenders' objections to the Plan cannot be determined at this time because there have been no findings respecting the value of Secured Lenders collateral as of the petition date or at any time subse-

The Subordination Agreement expressly provides that any such distribution be made directly to the Secured Lenders. Subordination Agreement § 2.2(a).

quent thereto; the objections that cannot be decided at this time are that:

(a) the Plan improperly applies adequate protection payments to reduce the amount of Secured Lenders' allowed secured claim; the Court makes no determination at this time as to the proper application of adequate protection payments;

(b) the Plan fails to provide for payment of Secured Lenders' superpriority section 507(b) claim; the Court makes no determination at this time as to whether Secured Lenders are entitled to a superpriority section 507(b) claim